[Filed June 18, 1892.]

## J. Q. A. BOWLBY ET AL. v. CHARLES W. SHIVELY ET AL.

TIDE LANDS—TITLE OF STATE—POWER OF SALE—RIGHTS OF NAVIGATION.—
When the state of Oregon was admitted into the union, the title to the tide lands within its boundaries vested in the state, which might, by virtue thereof, sell or otherwise dispose of all the lands between high and low tide, in fee simple, subject only to the paramount rights of navigation and commerce over the waters.

GRANT OF GENERAL GOVERNMENT—UPLAND OWNER—HIGH TIDE MARK.—
By a grant from the general government, an upland owner of real property abutting upon tide-water takes title only to high tide mark.

Clatsop county: FRANK J. TAYLOR, Judge.

Defendants appeal. Affirmed.

This is a suit to quiet title. The plaintiffs allege in substance that they are the owners and in possession of all the tide lands on the west half of block 141, on all of blocks 126 and 127 and north thereof, and on the west half of block 146 and north thereof, in the city of Astoria, as laid out by John M. Shively, by virtue of deeds from the state of Oregon, more than ten years prior to this suit; that the premises are within the corporate limits of the city of Astoria; that all the wharfing privileges and appurtenances thereto are owned by the plaintiffs; that they have erected and maintained a wharf in front of block 127; that the same extends out into the Columbia river; that the defendants,—husband and wife,—pretending to act under the provisions of the Astoria Sea Wall Charter Act, passed February, 1891, attempted, by a written instrument filed and recorded by them, to dedicate to the public, streets adjacent to the premises of the plaintiffs, except adjacent to blocks 126 and 127; that said instrument is void, and casts a cloud upon the title of plaintiffs, which they ask to have removed, and that the defendants be enjoined from setting up any title thereto.

The defendant C. W. Shively answered admitting plain-
tiffs' possession, but denying their title to the tide land on
any of the blocks except as to the west half of block 146.
The allegations in the counter-claim are in substance that
John M. Shively and his wife, in 1854, were the owners in
fee of a donation land claim embracing a large portion of
the present city of Astoria, and that by patent issued to them
in 1865, the said donation claim was bounded on the north
by the Columbia river; that on the twentieth day of May,
1854, the said Shively and wife laid out and caused to be
recorded a plat of the original town of Astoria, and also an
addition thereto, known as Shively's addition, in which
was embraced all the property in controversy; that the
land platted included not only the high land but also the
tide lands, and a portion of the bed of the Columbia river,
and that each of the blocks was bounded by a street sixty
feet in width, with the exception of the north tier; that a
portion of the said blocks in the north tier, including said
block 127, was bounded by a way thirty feet in width, but
that the remainder of the blocks in the north tier, including
block 146, was bounded by a street sixty feet in width;
that block 141 is partly above and partly below ordinary
high tide; and that lying between block 141 and the main
channel of the river are blocks 126 and 127; that north of
block 127 is the thirty-foot way already mentioned, and that
between said way and the ship's channel of the Columbia
river there is a distance of some eight hundred feet, upon
which no lots or blocks were laid out upon the plat; that
lying south of block 141 is block 9, which is alleged to be
entirely upon the high land, and is separated from block
141 by a street; that block 4 is partly above and partly
below ordinary high tide, and that north of and between it
and the main channel is block 146, and that between block
146 and the main channel is a street sixty feet in width.
It is further alleged that in February, 1860, John M. Shively
and wife executed a deed to one James Welch for blocks

146, 126, and 127, as laid out and recorded on said plat, and that on the same day they conveyed to Nancy Welch block 9 by a similar description, and that by various conveyances the plaintiffs have succeeded to the said title of the said James and Nancy Welch to the said blocks, but that the plaintiffs have no other or further right or title to the property in controversy other than such as they may have derived from the deeds of the board of school land commissioners; that on the eighteenth day of September, 1876, the state of Oregon conveyed to the plaintiffs by deed all the tide land in block 146, but that no deed has ever been executed to any one by the state for any tide land north of said block 146; and that on the same day, the state conveyed by deed to plaintiffs, with the following description, "all the tide land lying between ordinary high tide and ordinary low tide, lying both on and in front of the east half of block 5 in the tract known as Shively's Astoria, and including the tide land on the east half of block 145 in said Shively's Astoria; also that parcel, being all the land lying between ordinary high tide and ordinary low tide, both on and in front of block 9 in said Shively's Astoria, including all the tide land in block 141 in said Shively's Astoria, containing 4.63 acres, more or less." It is also alleged that John M. Shively, having acquired his wife's interest, and never having conveyed away the bank lots abutting and fronting on blocks 141 and 146, nor any rights north of blocks 127 and 146, except as inferable from the above described conveyances, did, on December 15, 1890, convey to C. W. Shively all his rights in the property in controversy.

The defendants ask that they may be decreed to be the owners of all the riparian and wharfage rights on block 141, and in front thereof to the deep ship channel of the Columbia river, except so much thereof as is embraced in blocks 126 and 127, and that they may be decreed to be the owners of the riparian and wharfage rights north of and

in front of block 4 in said town, to the said deep ship channel of the Columbia river, except in so far as those rights may be embraced in block 146. The plaintiffs demurred to the answer of the defendant C. W. Shively, setting up a counter-claim, which was sustained by the court below, etc.

*Sidney Dell*, and *W. W. Cotton*, for Appellants.

*J. Q. A. Bowlby*, and *Fulton Bros.*, for Respondents.

LORD, J.—The facts as stated above, for the purposes of the case, may be thus summarized: That John M. Shively, who was the owner of certain property on the Columbia river, platted and laid it out into blocks and lots, some of which extended below the line of ordinary high tide, and some below the line of low tide, and that he sold to James Welch the blocks already described, lying below the ordinary high tide, with reference to such plat, and that the plaintiffs have succeeded to Welch's title to the same, and that since then the plaintiffs have acquired by deed from the state of Oregon all the tide lands on and in front of said blocks. Under the title and rights thus acquired by purchase from the grantees of John M. Shively and from the state, the plaintiffs have built and extended a wharf into the Columbia river, which the defendants claim is an invasion of their property rights. This claim is based on the assumption that an upland proprietor of land adjacent to tidal waters has certain rights in such waters and the tide lands covered by them peculiar to that situation, which are not enjoyed in common with the people at large; and that among them is the right of access to the navigable water by means of wharves over such tide lands, usually called a right of wharfage, which may be made the subject of sale and reservation by such upland owner. Hence it is argued that when John M. Shively sold and conveyed the blocks in question with their appurtenances with reference to the plat made by him, no mention having been made of such wharfage rights, he did not part with them by force of

such conveyances, but that they were impliedly reserved, and as a consequence the wharf of the plaintiffs is an encroachment on his property rights. This assumption necessarily excludes the idea that the state may sell and convey its tide lands to a person not holding under the upland proprietor, so as to deprive such upland owner of his right of access to the navigable water by means of wharves and piers. On the other hand, the plaintiffs contend that the state may sell and convey its tide lands, and that its grantees take them free from any right therein of the upland owner, and subject only to the paramount right of navigation inherent in the public.

This proceeds upon the theory that the state is vested with the *jus privatum* and the *jus publicum* supposed to have been vested in the crown and parliament in the navigable waters and the soil under them. The distinction between such rights has been thus stated by EARL, J.: "From the earliest times in England, the law has vested the title to, and the control over, the navigable waters therein in the crown and parliament. A distinction was taken between the mere ownership of the soil under water, and the control over it for public purposes. The ownership of the soil analagous to the ownership of dry land was regarded as *jus privatum*, and was vested in the crown; but the right to use and control both the land and water was deemed a *jus publicum*, and was vested in parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interests of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by parliament. In this country, the state has succeeded to all the rights of both crown and parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the state." (*Langdon* v. *Mayor*, 93 N. Y. 155.) Hence it is argued for the plaintiffs that a patent of the United

States to a grant of land bounded by tide water limits the land conveyed to high-water mark, and gives the grantee no private or exclusive right whatever below that; that such a grant is exclusively a conveyance of dry land precisely as if it were bounded on all sides by dry land; that the state is the owner of the soil under water, or the tide lands, and as such owner may sell and convey such tide lands, and that its grantees may use and improve them by the erection of wharves, docks, or buildings, subject only to the paramount right of navigation, and that, as a consequence, upon the facts, the defendants have no private or exclusive rights whatever below high-water mark, or any property rights, wharfage, or otherwise, in the premises. This conclusion, it is insisted, is in harmony with our own adjudication, is the only principle upon which they can be sustained, and that the profession and people have so understood and acted upon them when dealing with such lands; so that a decision now adverse to them would tend to greatly disturb titles. It must be admitted, if this is a proper exposition of the law or deduction from it, as adjudged by this court, no matter what might be our personal view, if the question were *res integra*, it ought still to be adhered to.

Upon the admission of the state into the union, the tide lands became the property of the state, and subject to its jurisdiction and disposal. In pursuance of this power, the state provided for the sale and disposal of its tide lands by the act of 1872, and the amendments of 1874 and 1876. (Laws, 1872, 129; *id.* 1874, 77; *id.* 1876, 70.) By virtue of these acts, the owner or owners of any land abutting or fronting upon or bounded by the shore of the Pacific ocean, or of any bay, harbor, or inlet of the same, and rivers and their bays in which the tide ebbs and flows, within this state, were given the right to purchase all the tide lands belonging to the state in front of the lands so owned, within a certain time and upon conditions pre-

scribed; and providing further, that in case such owner or owners did not apply for the purchase of such tide lands; or having applied, failed to prosecute the same as provided by law, then that such tide lands shall be open to purchase by any other person who is a resident and citizen of the state of Oregon; but, in consideration of the fact that prior to 1872, as it would seem, these lands had been dealt with as private property, and sometimes improved by expensive structures, the acts further provided in such cases, that where the bank owners had actually sold the tide lands, then the purchaser of the tide land from the bank owner, or a previous bank owner, should have the right to purchase from the state.

These statutes are based on the idea that the state is the owner of the tide lands, and has the right to dispose of them; that there are no rights of upland ownership to interfere with this power to dispose of them and convey private interests therein, except such as the state saw fit to give the adjacent owners, and to acknowledge in them and their grantees when they had dealt with such tide lands as private property, subject, of course, to the paramount right of navigation secured to the public. These statutes have been largely acted upon, and many titles acquired under them to tide lands. In the various questions relating to tide lands which have come before the judiciary, the validity of these statutes has been recognized and taken for granted, though not directly passed upon. This will become manifest in the examination of the decisions of this court upon the state's ownership of the tide lands, and the effect of its conveyances of the same.

In *Hinman* v. *Warren*, 6 Or. 411, the land in dispute was tide land on the Columbia river, and was embraced within the description of land patented to John McClure and wife by the United States. The plaintiff claimed title to it by a chain of conveyances from the McClures, and the defendant by deed from the state. "Upon these facts,"

McArthur, J., said, "two questions arise: 1. Do the tide lands belong to the state? 2. Did the patent of the United States invest in the McClures any estate in the land lying between the north line of their claim, as described in the patent, and the line which marks the ordinary high tide? In answer to the first question, our response is, that the tide lands—those that are covered and uncovered by the ebb and flow of the sea—belong to the state of Oregon by virtue of its sovereignty. This doctrine is the clear result of the principle announced in all the cases from *Pollard's Lessees* v. *Hagan*, 3 How. *212, to *Barney* v. *Keokuk*, 4 Otto, 324. * * * As the state became the owner of the tide lands, it had the power, under the provisions of the act providing for the sale of such lands, (Miss. Laws, 644,) to sell the same. It has, however, no authority to dispose of its tide lands in such a manner as may interfere with the free and untrammeled navigation of its rivers, bays, inlets, and the like. The grantees of the state took the land subject to every easement growing out of the right of navigation inherent in the public. The second question finds its solution in the application of the familiar principle that 'a grant of land adjacent to a navigable river, below the farthest point inland to which the neap tide flows, extends only to the meander line of high tide.' It is of no consequence that the calls of the McClure patent place the north line between high- and low-water mark."

Upon the first question, the court holds that the tide lands—the land in controversy being such—belong to the state by virtue of its sovereignty. Some contention is made that the phrase which describes the ownership of the state as being "by virtue of its sovereignty," indicates that the title held by the state to such lands is as trustee for the public, and not as absolute owner, capable of conveying private rights therein, subject only to the paramount right of navigation; but the use of this phrase in that case was not designed to convey that meaning, when considered with

reference to the whole decision.  The contention was, that the title of the tide lands, before the admission of the state into the Union, was in the United States, and subject to its disposal; and as it had granted away by its patent the tide lands in question before the state was admitted, no rights of the state ever attached to them.  The court refused to accede to this view, but adopting the reasoning of *Pollard's Lessees* v. *Hagan, supra,* held that the state, upon its admission into the Union, became the owner of the tide lands, not as a grantee of the United States, but by virtue of its sovereignty, that the state had the right to dispose of such tide lands under the provisions of the statutes referred to providing for their sale, and that its grantees took them subject only to the paramount right of navigation existing in favor of the public.  The decision, therefore, is based on the idea that the state has a *jus privatum* in the tide lands distinguishable from the *jus publicum,* which it may sell so as to convey private interests therein; hence the phrase, by virtue of its sovereignty, was not intended to preclude any private use by the state's grantee which did not interfere with the public rights.  All this becomes more plain when the decision is considered with reference to the answer given by the court to the second question; namely, "that a grant of land adjacent to a navigable river below the farthest point inland to which the neap tide flows, extends only to the meander lines of high tides."  This conclusion rendered the fact that the line of the McClure patent included the tide lands in controversy of no consequence or effect; his grant being bounded by the Columbia river, or tide water, limits the land conveyed to the line of ordinary high tide, and consequently gave him no estate, or exclusive rights below that.

That this is the proper deduction to be drawn from the decision upon this point, is made still more manifest by the language of BOISE, J., in *Parker* v. *Taylor,* 7 Or. 446, wherein he says: "As before stated, the patent from the United

States conferred on the patentee no right to the tide lands lying between high and low water. These were the property of the state and absolutely at its disposal. Its deed gives to them—the grantees of the state—the same fee simple title to the tide lands as the patent from the United States gave to the land above high tide." This language is based on the idea that the state has a *jus privatum* in the tide lands; and its grantees take them free from any right or easement therein by the upland owner, and subject only to the paramount right of navigation inherent in the public. It excludes the idea that the title of the state, or its grantee, to the tide land is subject to an easement or right of wharfage over the land as a natural right in the upland proprietor. It is impossible, as counsel say, that the tide land should be subject to this servitude, if the grantee of the state takes "the same fee simple title to the tide land as the patent gave to the land above high tide." Moreover, in the same opinion, after stating that "the tide lands lying between high- and low-water mark belong to the state, and can be sold by it," and that "the state has the power to provide for and regulate wharves, as it had done by act of the legislature," Bᴏɪsᴇ, J., says: "Land situated as this is, covered with shoal water, may, under proper regulations by the state and municipal authorities, be reclaimed from the sea by filling in or by driving piles and building on them, and becomes private property and the subject of sale the same as any other property."

This view, that the state is the absolute owner of the tide lands, free from any easement of the upland owner therein, and subject only to the paramount right of navigation, is still further illustrated in the case of *Parkers* v. *Rogers*, 8 Or. 183. In that case, the court was considering the question of wharf rights in connection with the right of a person who has purchased tide lands of a riparian proprietor to a deed from the state to such tide land, if he makes his application to purchase the same in the time allowed

by statute, which necessarily involved the consideration of the act of 1872, and the act of 1874 amendatory thereof, *supra*, and their purpose and effect; and BOISE, J., said: "Though the state was under no legal obligation to recognize the rights of either the riparian owner or those who had occupied these tide lands, still the legislature, considering the facts that these lands had been dealt with as private property, and improved sometimes by the erection of expensive structures, which were of a great advantage to commerce, made what we think wise and just provisions for the protection of those who had spent their money in purchasing and improving these lands." While every one must, as the court says, regard these acts of the legislature as wise and just under the circumstances, yet, to avoid misapprehension, the court is just as particular to say that the state was under "no legal obligation to recognize such rights"; and as a consequence, if the state had not done so, neither the upland owners nor the purchasers from them would have had any rights whatever in the tide lands. In effect, it seems to us, in view of previous adjudications, as equivalent to saying that an upland owner on tidal waters has no rights as against the state or its grantees to extend wharves in front of his land, or to any private or exclusive rights whatever in the tide lands, except as he has derived them from the statute. It is true, the legislature of this state had made provision by which the upland owner within the corporate limits of any incorporated town might build wharves prior to the acts of 1872 and 1874, *supra;* but within the purview of our adjudications, it would, as a matter of power, have been equally competent to have given this privilege to others. (Hill's Code, § 4227.) But this act is not a grant: it simply authorizes upland owners on navigable rivers within the corporate limits of any incorporated town to construct wharves in front of their land; it does not vest any right until exercised; it is a license, revocable at the pleasure of the legislature, until acted upon or availed

of. (*Eisenbach* v. *Hatfield*, 2 Wash. St. 236.) Shively did not avail himself of the license, nor is there is any pretense to that effect. The plaintiffs have built a wharf upon and in front of their tide land. If the act is as applicable to tide lands as upland on navigable waters, they have exercised the right. The language of the act is, "the owner of any land lying upon any navigable stream or other like water," which would seem to apply to the owner of tide land; but, however this may be, the act has already received a construction from this court.

In *Parker* v. *Rodgers, supra,* after quoting this language of the act, BOISE, J., said, in speaking for the court: "We are aware that it is a general rule that what is appurtenant to land passes with it, being an incorporeal hereditament; but the right to build a wharf on the land of the state below high water is a franchise which attaches to the tide land, and is appurtenant to it rather than to the adjacent land, for it can be severed from the adjacent land, and enjoyed without it." This is predicated upon the idea that without the act an upland owner would have no right to build a wharf over the land of the state or tide lands, because the right or franchise attaches to the tide land, and is appurtenant to it, and not to the adjacent land. The grantor of the defendants did not avail himself of the license under the act; but the plaintiffs, as owners of the tide lands, have built a wharf; and in view of our adjudications, it is difficult to understand from what other source the right claimed by the defendants is to be derived. In the cases decided by this court, which have succeeded those mentioned, no other or different opinion in respect to the ownership of the tide land has been expressed by the court, or by any judge authorized to speak for it.

In *Wilson* v. *Welch*, 12 Or. 353, THAYER, J., undertook to express his own and a different view, not necessary to the decision of the case, and the other members of the court expressly refused to concur except in the result. In *McCann*

v. *O. R. & N. Co.* 13 Or. 462, the same judge, recognizing that his opinions upon that subject would not meet with the concurrence of his associates, especially in consideration of the fact that his particular view was not necessary to the decision of the case, said: "I have for some time maintained a different view from that of my associates upon the bench, and also from that expressed in the opinion of some of our predecessors in adjudged cases, regarding the nature of the state's title to lands between high and low water mark. * * * My opinion upon the subject was expressed in *Wilson* v. *Welch*, 12 Or. 353. * * * I still adhere to that opinion. * * * But waiving that view of the question, and conceding that the state is, as some of the authorities have said, the owner in fee of the lands referred to, and can grant them, with the incidental rights of the shore or bank owner, to any private person the state government may please to favor, and still I do not see how the appellant can be entitled to the relief claimed under the provisions of said chapter 63 of the laws of the state." As this quotation explains the situation, it is hardly necessary to make any comment, other than to say that the "different view" his associates maintained, so far as I was concerned, was that "the opinion of our predecessors in the adjudged cases" should be regarded as settled law, which could not be disregarded without disturbing titles and bringing disaster perhaps upon those who had accepted and acted upon those decisions as the law of the state.

In *Parker* v. *Packing Co.* 17 Or. 510, the only question in the case was whether ejectment would lie to recover a wharfage right, and the court was agreed that it would not. In the preparation of his opinion, however, THAYER, J., expressed, as usual, his "different view," but without the concurrence of his associates, which, by some oversight, is not noted in the case. As these expressions of his personal views are so purely *obiter*, especially in view of the preceding cases, the nonconcurrence of his associates in them was

hardly necessary to avoid misapprehension. It has been deemed necessary to review "the opinions of some of our predecessors in adjudged cases regarding the nature of the state's title to lands between high- and low-water mark," for the purpose of showing that these decisions are the foundation of the doctrine in this state,—that the state may sell and convey its tide lands, and that its grantees take them free from any right therein by the upland owner, and subject only to the paramount right of navigation inherent in the public; that this doctrine of the nature of the state's title to tide lands was so understood to have been adjudged in those cases by THAYER, J., and his associates, and was the producing cause of his "different view"; that Judge THAYER himself never understood or claimed that he was speaking for the court in the expression of such views, and that the nonconcurrence of his associates in them, in the first instance, was noted to avoid misapprehension, and for the reason that "the adjudged cases" had become the foundation of many titles and the law of the state, and ought not to be disturbed;—considerations which my present associates think ought still to govern us and to be adhered to, leaving out of view the stronger reason that "the opinions of our predecessors in the adjudged cases" are the better and more correct exposition of the law of the nature of the state's title to the tide lands. Nor is this doctrine peculiar to this state. In our neighbor state, Washington, the right of the state to dispose of its tide land free from any easement of the upland owner, is maintained in a well-considered opinion in *Eisenbach* v. *Hatfield*, 2 Wash. 353. That state, like our own, is largely affected by this question, and it is desirable that the rule of decision in the two states should be uniform. It certainly would be unfortunate if different rules should be established for either side of the Columbia river.

The cases regarded as leading in favor of this doctrine, are *Stevens* v. *Paterson etc. R. R. Co.* 34 N. J. L. 532, and

*Gould* v. *Hudson R. R. Co.* 6 N. Y. 522. In the former of these, BEASLEY, C. J., said: "That lands under water, including the shore of tide water in New Jersey, belong absolutely to the state, which has the power to grant them to any one free from any right to the riparian owner in them." This language, and the uses to which the tide land was put not being in aid of navigation, flouts the idea that the right of disposal as against the upland owner was intended to be limited in its application to public uses. In the latter of these cases, *Gould* v. *Hudson R. R. Co. supra,* it was held by the court of appeals that an owner of upland along high-water line on the Hudson river has no exclusive riparian rights below that line, and hence sustained no legal damage from a railroad embankment built under a grant from the state which cut off his access to the river. This decision is a rule of property in that state, and has never been questioned. Other cases in which the same doctrine has been held, are *Pa. R. R. Co.* v. *N. Y. R. R. Co.* 23 N. J. Eq. 157; *Mattheissen etc. Sugar Refinery Co.* v. *Jersey City,* 26 N. J. Eq. 275; *In re Water Commissioners,* 3 Eds. Ch. *290; *Getty* v. *Hudson R. R. Co.* 21 Barb. 617; *Tomlin* v. *Railroad Co.* 32 Iowa, 106; 7 Am. Rep. 106; *Canal Com.* v. *People,* 5 Wend. 423; *People* v. *Canal Appraisers,* 33 N. Y. 461; *Monongahela Nav. Co.* v. *Coons,* 6 W. & S. 101; *McKeen* v. *Del. Canal Co.* 49 Pa. St. 424.)

Nor does the supreme court of the United States assert any doctrine to the contrary. It recognizes the fact that the rights of the upland owner are matters of legislation and usage in the several states, and applies the law of the state accordingly. This is illustrated in the case of *Hoboken* v. *Pa. R. R. Co.* 124 U. S. 656, in which Mr. Justice MATTHEWS states and applies the law of New Jersey, as adjudged in *Stevens* v. *Paterson, supra.* In the absence of legislation or usage in the several states, they declare that the common law rule would govern the rights of the riparian proprietor, and that by that law the title to the tide lands is in the state. In *Weber* v. *State Harbor* ;

*sioners,* 18 Wall. 65, Mr. Justice FIELD, after stating that it was not necessary to controvert the doctrine of *Yates* v. *Milwaukee,* 10 Wall. 497, for reasons quite apparent, proceeds to say:   "Nor is it necessary to controvert the proposition that in several of the states, by general legislation and immemorial usage, the proprietor whose land is bounded by the shore of the sea, or of an arm of the sea, possesses a similar right to erect a wharf or pier in front of his land, extending into the waters to the point where they are navigable.   In the absence of such legislation or usage, however, the common law would govern the rights of the proprietor, at least in those states where the common law obtains.   By that law the title to the shore of the sea, and of the arms of the sea, and in the soils under tide water, is, in England, in the king, and in this country, in the state.   *   *   *   Upon the admission of California into the union upon equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations, or among the several states, the regulation of which was vested in the general government."

In *Hardin* v. *Jordan,* 140 U. S. 371, Mr. Justice BRADLEY said:   "With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted, inures to the state within which they are situated, if a state has been organized and established there.   Such title to shores and land under water is regarded as incidental to the sovereignty of the state,— a portion of the royalties belonging thereto and held in trust for the public

purposes of navigation and fishery,—and cannot be retained or granted out to individuals by the United States. *Pollard's Lessees* v. *Hagan*, 3 How. 212; *Goodtitle* v. *Kibbe*, 9 How. 471; *Weber* v. *Commissioners*, 18 Wall. 57.) Such title being in the state, the lands are subject to state regulation and control, under the condition, however, of not interfering with the regulations which may be made by congress with regard to public navigation and commerce. The state may even dispose of the usufruct of such lands, as is frequently done by leasing oyster beds in them and granting fisheries in particular localities; also, by reclamation of submerged flats and erection of wharves and piers and other adventitious aids of commerce. Sometimes large areas so reclaimed are occupied by cities, and are put to other public or private uses, state control and ownership therein being supreme, subject only to the paramount authority of congress in making regulations of commerce, and in subjecting the lands to the necessities and uses of commerce. (*Manchester* v. *Mass.* 139 U. S. 240; *Smith* v. *Maryland*, 18 How. 71; *McCready* v. *Virginia*, 94 U. S. 391; *Martin* v. *Waddell*, 16 Pet. * 367; *Den* v. *Jersey Co.* 15 How. * 426.) This right of the states to regulate and control the shores of tide waters and the land under them, is the same as that which is exercised by the crown in England. In this country, the same rule has been extended to our great navigable lakes, which are treated as inland seas; and also, in some of the states, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and in Pennsylvania to all permanent rivers in the state; but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised. In the case of *Barney* v. *Keokuk*, 94 U. S. 324, we held that it is for the several states themselves to determine this question; and if they choose to resign to the riparian proprietors rights which properly belong to them in their sovereign capacity, it is not for others to raise objections."

From all this it appears that when the state of Oregon was admitted into the union, the tide lands became its property and subject to its jurisdiction and disposal; that in the absence of legislation or usage, the common law rule would govern the rights of the upland proprietor, and by that law the title to them is in the state; that the state has the right to dispose of them in such manner as she might deem proper, as is frequently done in various ways, and whereby sometimes large areas are reclaimed and occupied by cities, and are put to public and private uses, state control and ownership therein being supreme, subject only to the paramount right of navigation and commerce. The whole question is for the state to determine for itself; it can say to what extent it will preserve its rights of ownership in them, or confer them on others. Our state has done that by the legislation already referred to, and our courts have declared its absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, unaffected by any "legal obligation to recognize the rights of either the riparian owners, or those who had occupied such tide lands," other than it chose to resign to them, subject only to the paramount right of navigation and the uses of commerce. From these considerations it results, if we are to be bound by the previous adjudications of this court, which have become a rule of property, and upon the faith of which important rights and titles have become vested, and large expenditures have been made and incurred, that the defendants have no rights or interests in the lands in question. Upon this point there is no diversity of judgment among us. We all think that the law as adjudicated ought not to be disturbed, independent of other reasons and authorities suggested in its support. Speaking only for myself, I own that if the question in respect to riparian ownership was *res integra,* I am inclined to the opinion that the owner of the upland on tide water has certain rights, arising from

his adjacency to such waters, subordinate, however, to their use by the public for navigation and fishing, which are not enjoyed in common with the public. But for the reasons suggested, I have felt bound to adhere to the law as adjudged by our predecessors.

It is, therefore, the unanimous opinion of this court, that there was no error, and that the judgment must be affirmed.