Argued October 23, 1930; affirmed March 3, 1931

## KATZ et al. *v.* PATTERSON et al.

(296 P. 54)

*Omar C. Spencer*, of Portland (Carey & Kerr and Ivan F. Phipps, all of Portland, on the brief), for appellants.

*Willis S. Moore*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondents.

BROWN, J. The plaintiffs have brought this suit to enjoin the defendants constituting the state land board from leasing to defendant Charles R. Miles certain lands in Clatsop county consisting of a sand bar or mud flat in the Columbia river situate about two miles upstream from Tongue Point, which lands are

claimed by plaintiffs as an accretion to certain tide lands purchased by plaintiff Katz from the State of Oregon on November 6, 1907, and referred to in this proceeding as the original Katz island.

The plaintiffs allege that during the period between the date of the purchase of these lands by the named plaintiff and the commencement of this suit in August, 1927, the sand bar or mud flat in controversy was built up by the imperceptible deposit of alluvium from the waters of the Columbia river on the northeasterly or upstream end of the original Katz island, and is therefore an accretion to the tide lands so purchased. They further allege that during the month of June, 1927, defendant Miles applied to the state land board for a lease covering this sand bar or flat, and the land board, pursuant to this application, advertised the property for lease. Thereupon, the plaintiffs instituted suit to restrain the leasing of the property.

The trial court found that the plaintiffs were the owners of the tide lands lying between the line of ordinary tide and the line of mean low tide in the Columbia river, acquired from the State of Oregon by plaintiff Katz on November 6, 1907, consisting of 267.04 acres. The third finding is as follows:

"That the State of Oregon is the owner of the following described tract of real property situate in the county of Clatsop, state of Oregon:

"Beginning at a point 11,155.22 feet north and 1,519.66 feet west of meander corner between Sections twenty (20) and twenty-one (21), township eight (8) north of range eight (8) west of the Willamette meridian; thence along low tide line of island

North 48 deg. 18' west .............. 203.01 feet
North 54 deg. 48' west .............1,502.73 feet
North 61 deg. 06' west .............. 500.68 feet
North 69 deg. 53' west .............. 495.19 feet

North 80 deg. 49' west ............ 216.49 feet
North 87 deg. 27' west ............ 700.00 feet
South 85 deg. 26' west ............ 201.96 feet
South 73 deg. 25' east ............ 194.81 feet
South 87 deg. 27' east ............ 700.00 feet
South 75 deg. 48' east ............ 260.41 feet
South 53 deg. 57' east ............ 401.18 feet
South 27 deg. 16' east ............ 383.08 feet
South 50 deg. 28' east ............1,110.14 feet
North 87 deg. 16' east ............ 486.90 feet
North 67 deg. 48' east ............ 340.14 feet

to place of beginning, containing 26.5 acres in Sections five (5) and eight (8), township eight (8) north of range eight (8) west of Willamette meridian.''

The court further found:

''That at the date of the conveyance to the plaintiff, Alma D. Katz, by the State of Oregon, * * * of the real property described in paragraph II hereof, that part of the bed of the Columbia river now covered by the land described in paragraph III hereof was covered with deep and navigable water, and was separated from the land described in paragraph II hereof by a current of deep and navigable water.

''That the land described in paragraph III hereof consists of alluvium, which gradually and imperceptibly accumulated on the bed of the Columbia river, beginning at a point several hundred feet from the land owned by the plaintiffs, and that same has been gradually built up by accretion, until it is now separated from plaintiff's land described in paragraph II hereof and the accretions to said land by a channel of water which is narrower and shallower than at the date of purchase thereof by said Alma D. Katz, but which is navigable at all ordinary stages of the water in the Columbia river at the location of said land.''

As a result of the trial a decree was entered holding, in effect, that the land in controversy belonged to the state of Oregon, free from any title or interest in plaintiffs, and dissolving the temporary restraining

order enjoining the state land board from leasing the land to defendant Miles. From this decree, the plaintiffs have appealed.

Oregon Code 1930, § 60-301, classifies as state lands the following:

"(f) Tide and Overflow Lands. All lands over which the tide ebbs and flows from the line of ordinary high tide to the line of mean low tide, and all islands, shore lands, and other such lands held by the state by virtue of her sovereignty."

See, also, the recent case of *State v. Imlah, ante* page 66 (294 P. 1046), where this court said:

"The rule unquestionably is that, where an island arises in a stream, the title to the bed of which is in the state, it does not belong to the owner of either shore. But if it is formed upon a portion of the bed which belongs to a riparian owner, it becomes his property: 1 Farnham on Water Rights (1904 Ed.), p. 276, and authorities there cited."

■■ We have seen that this controversy arises upon the plaintiff's claim that the land involved is an accretion to the tide island purchased by plaintiff Katz from the state in 1907, while the state contends that the property is a separate island formed on the bed of the Columbia river and hence is the property of the state. If the land is an accretion to the bed of the Columbia river, the title rests in the state: *Bowlby v. Shively,* 22 Or. 410 (30 P. 154, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331); *Van Dusen Investment Co. v. Western Fishing Co.,* 63 Or. 7 (124 P. 677, 126 P. 604); *Smith v. McGowan & Sons,* 131 Or. 522 (284 P. 189). In the McGowan case, the court held that the title to an island was vested in the state, and cited in support of its holding 45 C. J. 564, 27 R. C. L., 1375.

"'Accretion' is the increase of real estate by the gradual deposit, by water, of solid material, whether mud, sand, or sediment, so as to cause that to become

dry land which was before covered by water. * * *
The term 'alluvium' is applied to the deposit itself,
while 'accretion' denotes the act. However, the terms
are frequently used synonymously": 1 R. C. L., § 1,
"Accretion".

We shall now briefly review the evidence offered
in support of the various allegations.

To sustain their issues, the plaintiffs offered as a
witness Ivan F. Phipps, of counsel, who identified and
explained a number of exhibits proffered by them. He
also testified that he had made two trips to the site of
Katz island; that he "was there August 26, 1927, and
again on June 9, 1929." In describing the relation of
Katz island to the channel of the Columbia river, he
said:

"The so-called Prairie channel runs between Katz
island proper and the shore of the Columbia river, that
is the Oregon shore, and the main ship channel runs
northerly between Katz island and the Washington
shore."

This witness testified that Katz island was covered
above high tide with marsh grass, and that a straight
line of about 300 feet measured the distance from that
island to the "mud deposit" here in controversy. From
the plaintiff's testimony, it appears that on his first
visit to Katz island, this witness, accompanied by one
E. H. Welch, waded across from the head of the island
to the head of the land in controversy; and, when inter-
rogated concerning the depth of the water "most of
the way across from the spot where you started, as
shown on Exhibit 'G' to the end of the water where you
landed on the mud flat or sand spit in controversy,"
he answered:

"About ankle deep; there were no points where it
was over six to eight inches; most of the distance along
the sand-spit—that sand-spit that runs out, I should
say was three to four inches deep."

When asked on cross-examination whether the pictures constituting the exhibits were taken at "an extreme low stage of water or not," he answered:

"It was at a low tide. In so far as the particular body of water is concerned, I have no knowledge whether it was at a low stage or not. The tide was minus tide at the time and considered to be fairly low."

E. H. Welch, a man 75 years of age, engaged in real estate and fishing, testified that he was instrumental in having Katz island purchased in the first instance and that, at the time of the purchase, the only vegetation that grew on the island was tide land grass; that at that time Prairie channel, located between Katz island and the mainland, was, and ever since had been, navigable by vessels with a draft of about six or seven feet. He testified that he first saw the land in controversy above the waters of the river "probably about five years ago." He stated that he knew where it was located at the time of the trial, and when asked if he knew "where they originated, where they began to form," he answered, "Absolutely not. No, nor no other man." He further testified that he made a trip to Katz island with Mr. Phipps on August 26, 1927, and while there walked across the waters separating Katz island from the land in controversy; that he found "about three inches of water in some places, and deeper in others, * * * possibly a foot or fifteen inches," and that when he walked back the situation was practically the same.

W. E. Tallant, engaged in fishing and the cannery business at Astoria, testified that he was, and for thirty or forty years had been, familiar with the Columbia river immediately above Tongue Point, and with the location of Katz island. He stated that he thought

the land that was forming the tide flat in question came from the cutting of Katz island by the water. As to when he first saw this mud flat or sand-spit he stated, "I didn't pay any attention until about 1926 or 1927." He testified that it was covered by high tide, but that as to the distance it extended out of water at low tide, it "would be pretty hard to say." He further stated that there was no vegetation on it.

Charles R. Miles, one of the defendants, testified that he became familiar with the land in question in 1921 while hunting on Katz island; that, at that time, he saw "this sand bar" out there, and that it wasn't "so very long at that time." He further testified:

"Q. Was this sand formation you noticed in 1921 within the boundaries of that tract? A. Yes.

"Q. How far was it from the north shore * * * of the Katz island? A. At that time?

"Q. Yes. A. I judge about eight or nine hundred feet.

"Q. What intervened? A. A body of water, * * * a very swift current, either on flood tide or ebb tide.

"Q. Was the tract you noticed at that time connected above the surface of the water with the Katz island? A. No."

When asked how often he had seen the land since that time, he answered:

"From 1921 until 1925, I was there once a week during the hunting season, and since 1925 I have been there more than once a week. I lived there for two months right on the sands.

\* \* \* \* \*

"Q. Has there been any particular change with reference to the width of that channel during that time? A. In 1921 I believe it was narrower than it is now, although it is hard to tell; looking across water you can't tell exactly how far it is, but very little change except the ground it is cutting out. Naturally there would be a wider channel between."

This witness testified that he had been on these lands at all stages of the water. He said the channel was at least twelve feet deep, and deeper, in 1921, and that it had changed very little since that time; that the channel still exists at ordinary low tide and "at the lowest tide"; that he based his information upon sounding "around this ground before I thought of applying to the state for a lease. Therefore, I am familiar with the seining grounds and accretions, and I came to the conclusion there wasn't any accretions because of the deep water around there, and because of the apparent drop-off in the sands."

A. L. Johnson, of Astoria, engaged in fishing and farming since 1883, testified, on behalf of the defendants, that he commenced fishing near the land in controversy in 1896. Concerning this land, he said:

"There is two tide lands there. We call it the little sand and the big sand. There has always been two tide lands,—that you have reference to, that upper little tide land there is a slough between that, I will say that slough at outer water line, well—I think it is about seventy-five or eighty feet wide, * * * and in low water here in 1909, I had a scow there in 1909—a boat house * * * what I used in fishing time, and I had that anchored right on the end of that sand, that tide land."

He testified that he became acquainted with the tract of land now known as Katz island in 1895 or 1896, when he bought property near there and started fishing.

R. Akse, another fisherman of Clatsop county, testified that he had been acquainted with Katz island for twenty years. With relation to the island and surrounding territory, he testified:

"Q. Has there been any change in the depth of the water north of Katz island?

"A. There has. * * * There is more sand now than there was at that time, and nothing so wide as ——."

He stated that the sand is growing on the land in controversy, and extends above the water "in half tide," and that this lodging of the sand has interfered with his fishing. He further stated that he knew this land or tide flat was the land which the state proposed to lease to Mr. Miles.

E. C. Elliott, a resident of Astoria, testified that he had been a fisherman for at least thirty-five years; that, as a boy thirty-five years ago, he knew Katz island by the name of Gray island, and that he used to hunt on the island; that he had been around it several times at different stages of the tide, and that there was always plenty of water; that thirty-five years ago there was no formation north of that island; that it was all water. He testified that he was familiar with the land in controversy; that Katz island is composed largely of mud, while the land in question consists of sand; that he first observed this tract of land "about four years ago," and that it had been growing in extent to the west, downstream, but that, in his opinion, it had not grown closer to Katz island.

T. O. Campbell, a witness for defendants, and a fisherman of fourteen years' standing, testified that he has been acquainted with Katz island during all that period of time. He stated that every year since 1915 he has hunted about the island during the duck season, and that during the winter months he has run around between the island and the sand-spit with a fish boat. He swore that during all these years he had observed a formation or tide flat north of Katz island. With further reference to this flat, he testified:

"Q. Have you been familiar with it during all that time? A. Yes.

"Q. Has there been any change in its size as it appears above the water? A. Yes, sir.

"Q. What change has taken place? A. Only its extending further down where it was and getting wider.

"Q. Do you know what the depth of the channel has been immediately north of Katz island? A. Between Katz island and the sand?

"Q. Yes. A. It was, the last I know, I run through there with a fish boat and never measured it to get the depth, but I know there was water enough to get through with a fish boat * * *. It is so narrow you are apt to hit the bank one side or the other, but I could always get through."

He testified that the soil of Katz island, of which he supplied a sample, was mud, and that the land in controversy was chiefly sand. On cross-examination he testified:

"I hand you exhibits * * * showing the crossing of witnesses Phipps and Welch from the head of Katz island across to the head of the land in controversy, showing the depth of water as only up to their ankles, and ask you if in your opinion such water is navigable. A. Yes, it is navigable even through there, with a boat * * * drawing four foot of water."

He testified that he had gone through that channel in his boat at least fifty times during the preceding fourteen years. In commenting upon the exhibits showing plaintiffs' witnesses walking across in water only ankle deep, he says:

"The only way I could possibly figure it out a person could wade through would be a narrow strip of sand that runs from this state land, running east and west, at the upper end;—but between Katz island and this sand there is deep water."

The plaintiffs called as a witness Charles E. Stricklin, then assistant state engineer, who testified that pursuant to a request from the state land board that

the state engineer make an investigation of the conditions surrounding the land in controversy, he made two inspections thereof, and that "I established a gauge on the island under controversy and leveled that to the zero gauge, mean low water, the same as the Coast Geodetic Survey uses in preparing their tide tables, and by means of this gauge I determined the depth of the water between the Katz lands and the lands in controversy, and I found approximately at zero gauge, Coast Geodetic Survey datum, that there would be a depth of approximately one foot of water, and at about three foot gauge the island would be practically submerged." This testimony is in harmony with the report submitted by the state engineer to the land board, in which it is declared:

"That the land (in controversy) has never been connected with land not covered with water at M. L. L. W. to the tide lands now owned by Mr. Katz."

We believe that the circuit court properly determined that the sand bar in controversy is not an accretion to the tide lands acquired by plaintiff Katz from the state of Oregon in 1907, but that this property constitutes a separate island formed on the bed of the Columbia river, and is the property of the state.

In addition to the authorities hereinbefore cited, see 1 Water Rights in the Western States (3d Ed.), Wiel.

This cause is affirmed.

BEAN, C. J., and BELT, J., concur.