Getty *v.* The Hudson River Rail Road Co.

GETTY *vs.* THE HUDSON RIVER RAIL ROAD COMPANY.

The plaintiff owned a farm fronting on the Hudson river, and lying on an indentation, or bay, thereof. In front of his farm lay a level flat, from 1000 to 1500 feet in breadth, on which, at low water, there was only a few inches depth of water, and at high water some three or four feet. The flats were the property of the state. The plaintiff had, on his farm where it fronted the river, sand banks, from which, for many years, the brickmakers on the opposite side of the river, had procured moulding sand, usually taking it in the winter, with teams crossing on the ice, but sometimes by means of scows, which could approach within 50 to 200 feet, according to the height of the water. Easterly of the channel of the river, and along these flats, at a distance of from 1000 to 1200 feet from the plaintiff's farm, the defendants, under their charter constructed a continuous line of rail road, without drawbridge or passage for scows in summer, or for teams in winter, thus cutting off the access to the plaintiff's farm and sand banks, from the river, otherwise than across such rail road.

*Held* that no action would lie, either for a specific performance, by the defendants, of the duty imposed on them by the 15th section of their charter, to build a drawbridge opposite the plaintiff's farm, or to recover damages for the injury sustained; the plaintiff not being entitled to a drawbridge, and having no right to recover damages for an obstruction placed in front of his farm by leave of the state, and on the lands of the state.

The fact that some kinds of water craft can, at some times, pass near to the shore of a curve in the stream, does not constitute such a bay as, by the 15th section of the charter of the Hudson River Rail Road Company, the company are bound to furnish with a drawbridge.

That section, in view of public necessity, or convenience, can mean such bays only as have a *general* navigation, deserving the name of navigation.

No one individual can maintain an action for the specific performance of a *public* duty, imposed for the public benefit.

THIS was an appeal, by the defendants, from a judgment entered at the circuit, after a trial before the judge, without a jury. In his complaint the plaintiff averred, I. That he

owned a farm situate on a bay north of Hudson, that before the construction of the defendants' rail road, vessels were in the habit of coming into the bay, "much nearer to his said farm" than the line of said rail road. 2. That by virtue of such ownership, and the 15th section of the defendants' charter, he was entitled to have openings or a drawbridge through the line of the road, so as to permit vessels to get nearer the shore than they can now go. 3. That the defendants, in 1849, claiming to proceed under their charter, entered upon the river and upon the land and water between the farm of the plaintiff and the channel of said river and low water mark, to wit, 1000 yards therefrom, and made a solid embankment part of the way, and piling the rest of the way—commencing a mile above and continuing a mile below, opposite the plaintiff's farm—without a bridge or opening except through the piles, thus preventing boats with masts from going into the bay, &c.; claiming damages to $3000, for being deprived of the privilege of selling sand from sand banks on his farm near the shore, and for damages to accrue thereafter from the like interruption; and praying that the defendants might be decreed to open a drawbridge in the road opposite to his land, and to pay the damages sustained by the plaintiff. In their answer the defendants averred, 1. That the plaintiff's farm is situated on flats of mud, or gravel and grass, nearly or quite bare at low water, and not "navigable"—which extend westward also of the rail road, and between that and the channel of the river. 2. They denied that the plaintiff was entitled to a drawbridge through the road. 3. That the road was constructed in the river, 1000 feet from the shore, across the mud flats, and not taking or touching the plaintiff's lands, or in any way interfering with his rights, and on lands owned by the people of the state of New York, and that no dock or other convenience for navigation is inside of said road, and no drawbridge is required by the terms of the charter in such case. 4. That openings between the piles were left, to admit of such small boats as were accustomed to go into said cove, or nearer the shore, and through which the water has free passage.

Getty *v.* The Hudson River Rail Road Co.

The facts appearing upon the trial are stated in the opinion of the court. The judgment was for a specific performance by the defendants of the duties imposed upon them by the 15th and 16th sections of their charter, and for the payment of the damages sustained by the plaintiff, in consequence of their non-compliance with the provisions of those sections.

*John Thompson,* for the appellants. I. The plaintiff has no right to a drawbridge, founded on his ownership of the farm, or the water right extending two hundred feet in front. Neither of these rights is interfered with by the defendants. They neither touch nor take his property. *Gould* v. *Hudson River Rail Road Co.* decides this point, explicitly. (2 *Seld.* 522.) At page 541, the court say, " Among the rights peculiar to the plaintiff he enumerates that of the exclusive right to embark from his own land with all kinds of craft, or to use the natural shore down to high water mark as a landing place, to draw nets to his shore, &c. These exclusive rights do not belong to the appellant because his lands adjoin navigable waters, but because no other man can enjoy them, for the reason that if he enters on the appellant's land without his permission he becomes a trespasser. The water being in front of his land does not alter these rights ; but every other citizen has as good right as himself to fish in the water opposite his lands—provided he does not draw his net upon the appellant's premises. I can see nothing peculiar in these rights which is not possessed by any other person living a thousand miles from navigable waters." How can the existence of sand, or clay, or wood, on a farm adjoining the river, any more than of grain, give the owner a right to the waters and their navigation superior or different from that which belongs to an adjoining owner whose land does not touch the shore ? He has conveniences by reason of his contiguity to tide water, but no superior rights below tide water to those of any other citizen. (*Lansing* v. *Smith,* 8 *Cowen,* 46, *and on appeal,* 4 *Wend.* 9.) The plaintiff therefore has no right to a drawbridge by reason of his ownership of the farm on the shore, and the produce or soil he may be desirous of selling from it, to

be conveyed across the river or elsewhere.   In the case in 2 Sel-
den, the plaintiff alleged that the rail road, as in this case, was
constructed " between ordinary high and low water mark."   The
case does not show the precise distance from the shore at which
it was located ; it may have been five hundred feet, as in the
case now before the court it is actually twelve hundred feet be-
tween ordinary high and low water mark, the flats being usually
bare, or nearly so, at low water, and the rail road two hundred
feet inland of these bare mud flats.   Where then is the distinc-
tion in the two cases ? and how are we to discriminate ? or is
the width of the interval to govern, or the fact of a sand bank,
or clay bank, or gravel pit, on the adjoining premises ?   That
water flowed inside of the rail road and between that and the
shore, in Gould's case, is clear ; and if so, scows at high tide
could reach it, and lie nearer than after the rail road was built,
and this the complaint alleged ; and yet the decision, under the
provisions of the defendants' charter, was adverse to the plaintiff's
claim.   If it was not urged on the ground of its being a " bay,"
it was because such a ground was deemed absurd.   There is not
a shade of difference in principle between the two cases.

   II.  But it is claimed here that the obligation is imposed by
section 15 of the act of 1846, and that if it is lawful to build
the road in the river, still the company must erect a drawbridge
across every bay into which a vessel or boat could heretofore pass.
If this is the true construction of this section, then instead of
ten drawbridges between New York and Albany, endangering
the lives of travelers, there will be at least 100, for there is
hardly a mile of the way where vessels have not been at some
time or for some purpose within the line of the rail road.   No
such burden was ever imposed upon the company, and no such
danger to the public incurred :  First. It was the object of the
legislature to preserve as far as possible the rights of commerce
already existing along the river ; first to the public, in provid-
ing that no unnecessary impediments should be placed in the
way of the general navigation of the river ; and second, to
private persons, in providing for the extension of docks where
they were cut off by the rail road.  In taking care of the gen-

Getty *v.* The Hudson River Rail Road Co

eral interests of navigation of the public at large, they author-
ize a bridge over Spuytenduyvel creek, and other navigable
streams and inlets, with a draw of sufficient width to admit
vessels with standing masts navigating said river, and not to hin-
der vessels navigating the same, &c.  In connection with and
as a part of this sentence, they provide, " they are also required
to construct such bridges as may be necessary to provide for the
free passage of such vessels and boats as heretofore have, or
now can pass into and from the same, the bays that may be cross-
ed by said rail road."  The bays here mentioned are to be nav-
igable bays, having within them sufficient water at all times for
navigation, and the means or appliances and conveniences of
navigation.  Bays through which vessels were accustomed to
reach the shore for some purpose of trade or commerce, which
implies docks, wharfs, or other conveniences of this description,
and when purposes of public and not simply private convenience
were to be promoted.  This is the end the legislature had in
view : any other construction would give to any land owner or
even resident away from the river a right to sue the company,
for the owner of the second farm from the river may have a
mine or sand bed, and it may be more inconvenient for him to
sell it than for his neighbor adjoining the river.  The owner of
a farm adjoining the river has no rights over others, except of
getting to the water : the right of navigating from the shore he
only enjoys in common with others.  It is no ground of dam-
age that his sand cannot be sold as easily as before, any more
than that of the man living a mile in the interior.  To compel a
drawbridge into a bay, it must be a bay at all periods navigable ;
otherwise it does not secure the general interests of commerce,
and would in addition be useless one half of the time, at low tide
and half tide, besides being attended with great danger, as a
vessel half through might be left by the tide and jeopardize
the lives of all persons traveling upon the road.  The con-
struction claimed by the plaintiff would compel a drawbridge to
reach the shore all along the river, wherever a vessel could be
proved at any time to have lain along the rocks, to get stone, or
for any other temporary purpose.  No such casual, temporary

or private end was sought to be secured by the legislature; nay, if the language of the section is referred to, a draw on this principle must be placed wherever a vessel "now can" get into a bay, whether one has ever been there or not. This absurdity necessarily follows. Whereas if the obvious view taken by the legislature is adhered to, and bays used for the purposes of general navigation, such as the bays at Peekskill, Fishkill, and other places, where commerce is carried within them, are to have a draw, the necessity justifies the outlay, and compels the danger, and thus the public are secured in the exercise of the rights of navigation. Now here it will be borne in mind the plaintiff complains simply of the interruption of boats in the bay in connection with his occasional sale of sand, and that boats cannot get as near the shore as before. No general commercial interest is complained of as being infringed. No dock or place of wharfage is spoken of, nor is there any such convenience within the bay—nothing in which the public are interested—nothing the public could use, for if a dock even was erected the public could use it only by paying the wharfage. The public therefore have nothing to ask for here through the plaintiff. That a boat might possibly get nearer the shore at certain high tides than at present, in consequence of the road, does not surely impose the obligation of making drawbridges to permit such nearer ingress, inasmuch as no public commercial interest is to be subserved by such a dangerous structure. The numerous calamities to which draws are incident and subject, and thousands of lives that may be sacrificed by such an opening, ought to be well weighed before they are erected to secure the sale of a few loads of sand! and that too from the shore to which no vessel could ever approach! but only, in the language of the complaint, get a little nearer than at present! It is submitted moreover, that if the public interests are concerned in this, the attorney general should institute proceedings, and not a private person on his own behalf, alleging private damages. As it concerns the general interests of navigation, and is a duty that respects the public at large, any person sailing a vessel on the river, has as good a right to sue for damages as

Getty *v.* The Hudson River Rail Road Co.

the plaintiff. No such multiplicity of suits can be authorized. If the plaintiff can have a drawbridge opposite his farm, what prevents every owner of lands with fifty feet water surface at high tide, between the shore and the rail road, calling it a "bay," and demanding a drawbridge? The counsel on the trial was driven to affirm that this could be done! thereby rendering the road utterly valueless and unsafe. This court will pause before decreeing consequences so utterly ruinous to the road: it could not be used an hour with such a decree enforced. Second. But the legislature in granting this charter was not unmindful of the interests of individuals. They did not intend to create new rights, but to protect as far as possible those already existing; this is done. 1. By the provisions requiring draws, to get within bays used for navigation, the same as streams and rivers crossed, and 2, by extending docks cut off or intersected by the road so that they could not be used as formerly. The plaintiff occupies neither position. Where the road passes he had no rights; it neither takes nor touches his land, it is located on the people's highway, by their grant, and to some extent interrupts the convenience of every person compelled to cross over it to the river, or going across the river with boats! It is something in the way, and not there before, but still it interferes with no vested right of any one, for this convenience was held and exercised by all in common, and subject always to such changes as the people might at any time authorize. It might have been convenient for a farmer to carry his hay or grain across the river to some storehouse before the road was constructed, and it may be somewhat less convenient to pass under the road or over the road in now doing the same thing, but still the road interferes with no right of the plaintiff and subjects the company to no action, any more than if the state had constructed the work. Was it ever supposed that owners of contiguous lands could sue the state for erecting stone embankments along the Castleton flats, because by such obstruction they could not get to the river? It interferes with a convenience, but not with a right. It was defined an improvement to the general commerce of the state, and a rail road is surely entitled to be

placed on the same footing. Third. This case is not beyond the scope of general principles in relation to commerce, and in reference to which this section (§ 15) was enacted. Where vested private rights are not concerned, but public convenience only, the less must give place to the greater. The thousands that travel upon the road are not to have their lives imperiled to accommodate the owner of a sand bank along the river; the convenience of the many is paramount to that of the few. If the principle contended for be correct, every owner of a clay bank or sand bank, inside of the road, is entitled to a draw, provided he could float a vessel at any tide nearer the shore than at present. Such a construction would be utter ruin to the road, and its safety. No one could venture his life upon it, beset with so many dangers. The legislature intended no such absurdity, and this claim is prosecuted not for the purpose, or in the hope of compelling a bridge, but to extort a bonus from the rail road company to buy off rights which the plaintiff does not possess.

III. The court erred equally in awarding damages. The only fact sworn to was, "I think the sand taken from the plaintiff's land comes to from $200 to $300 a year." It is an opinion, and not admissible. Who took the sand? no one; in fact the whole complaint is that it was not taken. If not taken, as the fact is, the plaintiff has it still. On this principle he will get pay year by year for his whole farm, by the scow load or sleigh load, and yet possess it all the while undisturbed; or will it in time become the defendants' property when all paid for by the load? No damage was proved, and the judgment is erroneous in this respect also. If the plaintiff may have damages because he has sand or clay on his farm which he has not sold, what prevents all other persons who have wood on the adjoining lands, which might have been sold to the brick yards, by possibility, from recovering damages from the defendants for its value?

*H. Hogeboom*, for the plaintiff. I. The defendants were, by their charter, bound to build a bridge, with a suitable draw,

across the bay which fronted the plaintiff's farm. (*Laws of 1846, p.* 279, § 15. 8 *How.* 177.)

II. A bay requiring such a structure existed in this case in front of the plaintiff's farm, where there were valuable banks of sand, from which the plaintiff and former owners were in the habit of selling and transporting sand to various persons.

III. The plaintiff and previous owners were in the habit of deriving considerable revenue therefrom, and such revenue equaled $150 per annum.

IV. Prior to the construction of the rail road, in 1851, vessels and boats, with and without masts, could and did navigate this bay inside of the rail road, and near the shore of the plaintiff's farm.

V. Access to this bay was entirely cut off by the defendants' rail road in 1851, which formed a continuous obstruction across the entire front of the plaintiff's farm, and still continues.

VI. The damages sustained by the plaintiff were at least $450.

VII. The relief, therefore, to which the plaintiff was entitled, and which the court gave him, was (1.) A specific performance of the provisions of the statute, viz: the building of a bridge with suitable draws, as required by 15th section. (2.) Compensation for the damages already sustained to the amount of $450. (3.) A provision to assess future damages until the defendants should comply. (4.) The costs of the action.

VIII. The right to enforce a specific compliance with the provisions of the charter exists in this case ; and such compliance may be enforced at the instance of any party aggrieved. (1.) It is clear that the charter and its acceptance constitute a contract between the people and the rail road company, and that the defendants are bound to comply with its provisions. (2.) It being a *contract*, all the ordinary incidents of a contract attach to it, and among others the right, in a fitting case, and where mere damages furnish an inadequate compensation, to enforce a specific performance. (3.) The remedies for a violation of the contract attach to the *people* in their sovereign capacity for such violations of it as are generally injurious to the

public and not peculiar or special to the individual citizen. (4.) But where the injuries are of the latter character, and the individual citizen is subjected to damage, over and above that which every individual in the community, as a member thereof, is supposed to sustain, then he is entitled to a remedy (and if necessary, that of specific performance,) to redress the injury. (5.) He is entitled to this remedy : because, as to such injuries, the contract is made *for his benefit*, and upon the expectation supposed to exist between the legislature and the defendants that he will have the right to prosecute for it. Because, to such extent, the people are supposed to *delegate* to him the right to enforce the contract. Because, to such extent, the people are supposed to act, and do act, merely as the *agent* or *representative* of the individual citizen. Because, to such extent, the contract is made *directly* between the defendants and such individual citizens. (6.) The injury in this case is of a special and peculiar character, and, so far as appears, the plaintiff is the only party aggrieved. If others are similarly situated, owning valuable sand banks on this bay, it is a mere objection of non-joinder of parties plaintiff; and not being taken by demurrer is unavailable. (7.) If he had a *wharf* or *dock* cut off by the rail road, there would be no doubt of his right to a private action ; and it is submitted, no doubt of his right to compel its restoration to it former usefulness. (*Sec.* 15 *of the charter.*) So of convenient passes or roads across the rail road, where it intersects the lands of individuals. (*Sec.* 16 *of the charter.*) So where the rail road intersects or crosses a stream of water, which, or the use of which, belongs to an individual. (*Sec.* 14 *of the charter.*) In all these cases the company has agreed to perform the acts required by the charter, and mere damages for non-performance furnish a very inadequate remedy. (8.) Unless this is the true doctrine, parties may be forever without redress ; for the public or the attorney general may never *move* or consent to file an information, bring a *scire facias*, or institute a suit for specific performance. Indeed, as to injuries strictly *private*, it may be doubted whether they could do so.

IX. In any event the plaintiff is entitled to the residue of

the relief sought by him, viz : damages for the injuries sustained, and a provision for future damages. These are sufficiently averred in the complaint. So also is the obligation to build the bridge, and the right of the plaintiff to a free passage, sufficiently averred. And the prayer for relief is sufficiently-broad and comprehensive to embrace it. No objection whatever was taken at the trial on this ground. Nor were any objections taken to the plaintiff's claim or testimony, except of the most general character, and not sufficient, as we insist, to raise the questions above discussed.

*By the Court,* GOULD, J. The findings of facts at the circuit being by the judge, without a jury, there would be no need of commenting on them here, were it not that passing them by might seem to imply an acquiescence in their correctness, and prejudice future proceedings in the action. The testimony does not seem to the court to come up to the statements in the decision, and the facts, as they appear here, (so far as the situation and uses of the plaintiff's lands are concerned,) may be thus stated. The plaintiff owns a farm fronting on the easterly shore of the Hudson river, and lying on an indentation, or bay, of such easterly shore. In front of his farm, for a distance varying from 1000 to 1500 feet in breadth, (east and west,) along his whole front, lies a level flat, on which at low water there is but a few inches depth of water, and at high water some three or four feet depth of water. The flats are the property of the state, and the channel of the river lies westerly of them. The plaintiff has, on his farm, where it fronts the river, sand banks, from which, for many years, the brickmakers on the opposite side of the river have procured more or less of moulding sand. This they have taken chiefly in the winter, with teams crossing on the ice, though they could take it, and have taken it, at times, by scows (with and without masts) of from 16 to 60 tons burthen, which scows they could lay within about 200 feet of the shore at low water, and there loaded them by teams, while at high water they could go within 50 feet, and then be loaded by means of long planks, directly from the shore. The *value*

of the annual sales is quite uncertain. Easterly of the channel of the river, and along these flats, at a distance of from 1000 to 1200 feet from the plaintiff's farm, the defendants, under their charter, (*Laws of* 1846, *p.* 272,) have constructed a continuous line of rail road, without drawbridge or passage for scows in summer, or for teams in winter; so cutting off the access, by the river, to the plaintiff's farm, sand banks, &c., and destroying the *navigation* he before had. For this injury he brings this action, and claims 1. A *specific performance*, by the defendants, of the duty imposed on them by the 15th section of their charter, to build a drawbridge opposite his farm. 2. Damages for the injury already done to him, and a provision (in the judgment) for any further damages he may sustain, before the defendants build the drawbridge aforesaid.

The case of *Gould* v. *The same Company*, (2 *Selden*, 522,) would have entirely settled this case, were it not that the plaintiff's farm fronts on "a bay," and therefore, is claimed to come within the provision, as to building drawbridges "for the free passage of such vessels," &c.) into and out of such *bays*

The *general* question of *damages* for injuring the *private* rights (of navigation, fishing, &c.) of individual proprietors along the bank of this river, where the company has under its charter *built on the property of the state*, would seem to be very clearly and decidedly adjudged, in the case just cited, and can require no detailed opinion here. *If* this case be not so different from that, by reason of the plaintiff's location on a *bay*, as to *entitle him to a drawbridge*, then (by that case) he has no right to recover *damages* for an obstruction that is there by leave of the state, on the lands of the state. Is he, then, entitled to have a drawbridge built there? Can his prayer for specific relief be granted? I must say that the answer to this question seems to me as plain, as does that to the previous part of the case; and it is twofold. 1. No one individual can maintain this action for a specific performance of a *public* duty, imposed for the *public benefit*. In this particular case, there are *four farms* fronting on this bay. Has *each* proprietor a right to such specific performance, by having a drawbridge built in

Getty *v.* The Hudson River Rail Road Co.

front of *his* farm? If so, *four* drawbridges must be built in about one mile! If not, how is this plaintiff entitled to have it in front of *his* farm, rather than either one of the other three to have it in front of *his*? The mere statement of the case shows the duty to be a *public* one; the benefit, intended to be secured, is for *the public.* And that public, the people of the state, by the proper officer, and they only, can institute proceedings to compel a compliance with that duty.

2. It cannot be that this " *bay,*" if correctly described in the statement of facts, is *such* a bay, as by the 15th section the company are bound to furnish with a drawbridge, " to provide for free passage of such vessels as heretofore have passed, or now *can* pass," &c. That some sort of water craft *can,* at some times, pass near to the shore of a curve in the stream, does not make the " bay" spoken of.

It can mean, in view of public necessity, or convenience, such bays only as have a *general* navigation, deserving the name of navigation. The utmost pretended extent of the navigation of this bay, falls far short of the *commercial facilities* afforded to its trade by the *ice* in the winter; and a drawbridge, to allow *teams to pass* in *the winter,* will probably not be claimed as within the intention of the legislature.

A new trial must be granted.

[ALBANY GENERAL TERM, March 3, 1856. *Harris, Watson* and *Gould,* Justices.]