The Hudson River Railroad Company was incorporated by chapter 216 of the Laws of 1846, and consolidated with the New York Central Railroad Company in the year 1869, assuming the name of the New York Central Hudson River Railroad Company.
At the time of the construction of the Hudson River railroad in 1846, one John Cocks was the owner of the premises in question, and operated thereon a brick yard. The Hudson River Railroad Company condemned the right of way across the premises of Cocks, passing over the same on an embankment some ten feet high. This embankment cut off the eastern portion of the premises from the bulkheads and wharves on the river front.
Section sixteen of the charter of the Hudson River Railroad Company reads as follows: "It shall be lawful for the owners of the land over which such railroad shall be constructed, to cross the said railroad, at some convenient place or *Page 190 
places, with his or their servants, cattle, teams and carriages, for the purpose of using and managing their respective farms, over which the said railroad shall pass, doing no injury or damage to said railroad. In all cases where such railroad shall intersect the lands of any individual, or pass between such lands and the usual place of access to the river, and cannot be conveniently crossed by reason of high embankments, deep cuts or otherwise, the said corporation shall at their own expense construct and sustain convenient passes or roads across or under the railroad, for the passage of persons, cattle, carriages and teams, for the purpose of farming or managing such lands, and giving to them their usual access to the river."
In recognition of the necessity for providing means of access to the river front the company, at the time of constructing this embankment, pierced it by six culverts, which are described in this record as C-1, C-2, C-3, C-4, C-5 and C-6. C-1 has an opening of twenty-three feet; C-2 measures twenty-one feet; C-3 twenty-three feet; C-4 twenty-eight feet; C-5 twenty-seven feet and C-6 thirty feet. This embankment intersected no streams on the premises of Cocks, and these culverts were erected for the purpose of a passage for teams and cars moving upon trestles from the brick yard to the wharves and bulkheads. The manufactured brick were shipped to market on vessels loaded at these wharves. The relator is the successor in interest of Cocks.
The relator's papers disclose, among other things, that the manufacture of brick continued from the time of the erection of this embankment until sometime in the year 1900, with the exception that there have been times when for several years the brick yards have not been used. It is further alleged that the culverts are indispensable to the usefulness of the brick yard company, and without each of them the property is useless as such.
It is further averred that in the latter part of 1900, or the early portion of the year 1901, defendant entirely closed up and partially filled up culvert No. 1; that culvert No. 2 has been reduced on each side one foot of the width of the same, *Page 191 
and culvert No. 3 is all filled up; that culvert No. 4 is reduced in width one foot on each side, and culverts Nos. 5 and 6 have been entirely filled up. That culvert No. 1 was used for the freight house on the pier, culvert No. 1 being used for passage one way and culvert No. 2 for passage the other way. Culvert No. 3 was used for loading brick from the yard No. 1 on vessels at the pier or wharf immediately west of the same. Culvert No. 4 was used for loading brick at the pier or wharf immediately west of the same. Culvert No. 5 was used for bringing wood in and for loading brick from yards Nos. 2 and 3 at the bulkhead west of said culvert; and culvert No. 6 was used for loading brick from the yards Nos. 2 and 3 at the pier west of said culverts.
The defendant's papers in opposition to this motion allege that the premises have not been used for the manufacture of brick, nor have brick yards been operated thereon since the year 1896, with the exception that during the year 1899 two experimental burnings of enameled brick were made on the premises; that the experiments were not successful, and since that date all the buildings and sheds upon the premises used for the manufacture of brick have been removed, except a two-story brick building erected for a power house by the Croton Brick Company, and now occupied by a tenant, who uses the same for the purpose of grinding emery, and that the furnace on the premises is now in ruins, which was used by the persons or company engaged in the experiments aforesaid for the manufacture of enameled brick.
It is suggested by the Appellate Division that the affidavits of the defendant present no material questions of fact, for the reason that certain statements are made on information and belief in denial of allegations in the relator's papers positively alleged.
There is no doubt of the general rule that where the positive allegations in support of a motion for a writ of mandamus are met by denial on information and belief that no issue is raised. (People ex rel. Kelly v. Common Council, 77 N.Y. 503.) In the case at bar the allegations already referred to, *Page 192 
as contained in defendant's papers, are upon information and belief, and if they stood alone it would be doubtful if any issue was tendered, but other material allegations appear which are positively stated.
The defendant's papers further disclose that the trestle work used by the brick company, upon which cars were moved from the river through the culvert to the premises in question, is in ruins; that only one of the culverts mentioned in the moving papers, used by the present sole occupant of the premises, is culvert known as C-4, and that it is impracticable, because of the location of the works employed in the grinding of emery, to use any other of the said culverts; that said culvert C-4 at the present time is about twenty-six feet in width and is at least eight feet in the clear; that the piers and bulkheads on the westerly side of defendant's railroad, opposite the premises in question, are in such a state of ruin that they are impracticable for the loading and unloading of vessels. This last allegation is based on the opinion of the affiant, a civil engineer.
It further appears that the clay bank upon the premises from which the material must be taken in order to manufacture brick thereon, is at the present time about fifteen hundred feet east of the railroad tracks, and from deponent's knowledge of the business of manufacturing brick, all kilns and dry yards necessary for the manufacture of brick upon the premises would be erected at such a distance easterly from the railroad that all tracks necessary for the conveyance of fuel from the docks and burned bricks to the docks, would be laid in converging lines to one culvert under the railroad tracks, and that no more than one culvert would be necessary for the proper operation and management of any brick yards located upon the premises.
It further appears that on April 10th, 1901, the affiant examined the clay beds upon the premises, and that in his opinion no excavations have been made therefrom during eight years last past; that any break in the continuity of an earth-supported track of a railroad on which rapidly moving *Page 193 
trains are run, is a serious danger to the safety of the traveling public, and it is, therefore, desirable that culverts, such as the ones described in the moving papers, shall be eliminated.
The defendant also submitted the affidavit of the superintendent of the Hudson division, who has occupied that position for ten years last past, stating that he is familiar with the premises in question, and that at the points where the culverts are located there pass over said main line daily at least two hundred trains.
The sole question presented upon these papers is whether an issue was tendered by the defendant which rendered the granting of the peremptory writ of mandamus improper. The defendant contends that section sixteen of the original charter of the Hudson River Railroad Company, already quoted, is the only section applicable to this proceeding, and that the obligation imposed thereby was to maintain such culverts or other openings or means of crossing as were reasonably necessary; that if the relator has been deprived of such crossings as he is entitled to under the statute they should be restored; and if, on the other hand, conditions have changed so that a less number of culverts will serve to meet the necessities now existing, the reduction of the original number has worked no injury to the relator.
It is manifest on reading this record that the issue of present necessity is tendered and the granting of the peremptory writ was error, unless it be held, as matter of law, that the charter of the Hudson River Railroad Company must be so construed as to require the defendant to perpetually maintain the culverts deemed necessary in the year 1846, when this embankment was constructed.
Such a construction of the statute is unreasonable and would work injustice, not only to the railroad company, but to the owners of property intersected by the tracks of the defendant. From the standpoint of the property owner in a given case it might well be that conditions were such in 1846 that one culvert was amply sufficient for access to the river front, and at the present time, owing to the erection of a large manufacturing *Page 194 
establishment, or other changes that may be reasonably assumed, necessity would require in the case of an extended water front a number of culverts. Under these supposed conditions, it would be within the letter and spirit of the statute and impose no hardship upon the railroad company, to compel it to provide the property owner reasonable approaches to the water front. Viewing this question from the standpoint of the railroad company, it would seem to be clearly within the provisions of the statute that if conditions have so changed since the construction of the railroad as to warrant the maintenance of less culverts than were originally built in the year 1846, a reduction in number should be permitted.
The statute imposes a continuing obligation upon the railroad company, and also affords constant protection to the rights of the property owner whose lands are crossed by the tracks of the former.
To say that the rights of the parties to this controversy depend wholly upon the situation as it existed in 1846, when the railroad was built, is to ignore the obvious intention of the legislature.
The railroad company, while held strictly to its continuing obligation to construct and sustain "convenient passes or roads across or under the railroad," is not to be subjected to unnecessary or unreasonable burdens; the property owner, on the other hand, has the continuing right to the usual access to the river "for the purposes of farming or managing said lands."
As the years pass the question of present necessity is one that can be raised by either party. The principle involved is illustrated by cases where a covenant concededly binding upon a defendant will not be enforced in equity by reason of changed conditions.
In Trustees of Columbia College v. Thacher (87 N.Y. 311,313) the defendant, owning property corner of Fiftieth street and Sixth avenue in the city of New York, was sued to enforce the observance of a covenant not to permit "any kind of manufactory, trade or business whatever" on the premises. The defendant was in conceded violation of the covenant, but on the trial established such changes in the condition of the *Page 195 
adjacent property and the character of its use that the court held there was no ground for interference and that it would be inequitable to enforce the covenant. These changes were due to the construction of the elevated railroad and the general invasion of the locality by business.
This case was approved and followed in Amerman v. Deane
(132 N.Y. 355, 359) and reference made to other cases. (Conger
v. N.Y., West Shore, B.R.R. Co., 120 N.Y. 29; Margraf v.Muir, 57 N.Y. 155; Peters v. Delaplaine, 49 N.Y. 362; High on Injunctions, § 22. See, also, Murdfeldt v. N.Y., WestShore, B. Ry. Co., 102 N.Y. 703.)
There is no reason, on principle, why obligations imposed by the legislature should not be subject to the rule of changed conditions as are the covenants contained in private contracts.
The issue of present necessity is clearly presented by the papers, assuming, as we must, the truth of the allegations set forth in defendant's opposing affidavits, and the issuing of the peremptory writ was unwarranted.
We express no opinion as to the merits of the case, as all the facts upon which this controversy is to be decided may not have been disclosed.
The defendant raises the additional point that the relator has an adequate remedy at law and was not entitled to the writ of mandamus.
An action for damages in this case would be inadequate, and the existence of an equitable remedy is no bar to the writ although it may influence the court in the exercise of its discretion. (People ex rel. Moulton v. Mayor, etc., of N.Y. 10 Wend. 395; High's Extraordinary Legal Remedies, § 20.)
The orders of the Special Term and Appellate Division should be reversed, with costs to abide the event, and these proceedings remitted to the Special Term, with directions to issue an alternative writ of mandamus under which the issues herein shall be tried.
PARKER, Ch. J., HAIGHT, VANN, LANDON, CULLEN and WERNER, JJ., concur.
Ordered accordingly. *Page 196