ANNE S. VAN CORTLANDT and Others, Plaintiffs, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

Supreme Court, Westchester County, April 27, 1931.

*Hawkins, Delafield & Longfellow* [*E. J. Dimock, M. Gregg Latimer, Eleanor S. Birch* and *Cornelius O. Donahue* of counsel], for the plaintiff.

*Jacob Aronson* [*Frederick L. Wheeler, William Mann, Leo Manville* and *K. O. Mott-Smith* of counsel], for the defendant.

MORSCHAUER, J. The plaintiffs are heirs of the original patentee of the manor of Cortlandt, and own a parcel of land which may be roughly described as a rectangle, bounded on the west by the New York Central tracks, on the south by the Croton river, on the east by the Albany post road, which is carried over the Croton river by a bridge, and on the north by a road running from the Albany post road to Harmon station.

The nuisance complained of is the unauthorized and illegal

maintenance by the defendant of a rigid railroad bridge across the Croton river which, the plaintiffs claim, effectually prevents the navigation of that river by vessels. The plaintiffs allege, also, that they are specially damaged by the nuisance because they are riparian owners whose property alone abuts directly on the nuisance and that the value of their property has been substantially impaired by the existence of the nuisance.

The defendant's predecessor, the Hudson River Railroad Company, was organized in 1846 by a special act of the Legislature, for the purpose of constructing a railroad from New York to Albany across the navigable creeks and streams running into the Hudson river on the express condition that such bridges should " contain a draw of sufficient width to admit the passage of vessels adapted to navigation of said river, streams or inlets with standing masts," etc.

From about 1847 to about 1907 the said railroad maintained a drawbridge over the Croton river, which it erected in the former year. In about the year 1907 the drawbridge was discontinued, a rigid immovable bridge constructed on masonry abutments was erected, and it is this bridge which now prevents the navigation of the said Croton river to and from the lands of the plaintiffs on the Croton river into the Hudson river; in fact, the Croton river is entirely closed to navigation to large vessels.

The Croton river from the Croton or Cornell dam to where its waters flow into the Hudson river is about three miles in length. For about two miles of this distance it is a fresh water stream supplied by the overflow of the dam and by the natural runoff of the waters of the land bordering on the river. At the dam the city of New York impounds the water and diverts it through underground channels or aqueducts to its water supply and the millions of gallons of water that formerly found their way to the Hudson river are thus diverted in another course in the aqueducts.

Above the masonry are flash boards further holding back the water which formerly overflowed. Below the dam are pools of water only, and except in very rainy seasons there is little water in the Croton river from the Croton dam to a point a mile or so east of the defendant's railroad bridge, except such as comes from the adjoining land and from springs bordering on the river, and what water there is flows in a southwesterly direction among boulders and rocks between steep banks in a winding channel which is unnavigable. About a mile from the defendant's railroad bridge and at a place called the deep hole there is the beginning of tide water, and from this point the river gradually broadens out until it finally forms the Croton bay. The manor house and the ferry house are located on the northeasterly side of the Croton river a

short distance above the present State highway bridge on the Albany post road, which is carried over the said post road by culverts, one at the southerly end and one at the northerly end, with a fill between the same. The culverts and fill are permanent structures erected by the State. From the beginning of tide water and opposite the plaintiffs' property as far as the railroad bridge, the Croton river has become filled with sedge, and the bay likewise, and this sedge land is alternately covered and exposed with the rise and fall of the tide.

Plaintiffs' property is located a mile or more from the deep water of the Hudson and the channel leading to the same is about eighty feet wide at mean high water and with a minimum depth of one and six-tenths feet at mean low tide. At low water one can walk from Crawbuckie point on the Croton river just west of the defendant's railroad tracks to Croton point. A sand bar about 500 feet west of the railroad bridge is constantly being added to by the action of the river and the tide and thus encroaching further upon the channel as it now exists.

In former days light draft boats and vessels passed up the Croton river as far as the deep hole, but in 1841 the bursting of the Croton dam inundated the stream and carried down huge quantities of sand and debris, clogging the channel and rendering it unfit for navigation by other than boats and vessels of light draft, which could only be poled by hand up stream on a rising tide. This practice, however, continued but a short time and was finally discontinued as the channel further filled with the lapse of years. The wire mill of generations ago, located at the deep hole, was not a financial success and was abandoned. Today the place where the mill stood is a jungle of trees and bushes and little is left to locate it.

The Oliver or Potter dock on the southerly bank of the Croton river just below and to the west of the post road bridge has deteriorated. It is only an apology for a dock. It is now and has been for many years in a state of deterioration, and the approaches to it are filled with brushes and elm and other trees. Except for a few industries there never was any commercial navigation on the Croton river. Small boats and small launches use the river today and this has been so for many years. Time has wrought natural changes and due to the fill, sedge and other debris the river channel outlived its usefulness because of the natural conditions that always follow in the circumstances surrounding such streams as the Croton river and bay.

The river and bay of today are not navigable except for small boats and launches and then for a very limited area, and will only

be kept so by being dredged, except in so far as the natural force of the flow of the Croton river will keep some part of the channel open.

The court, pursuant to stipulation of the respective attorneys, visited the premises in question upon two occasions, one occasion being at low tide and the other occasion being at high tide, and made a careful examination, not only of the property of the plaintiffs, but of the Croton river, the Croton dam, and of the property bordering on both sides of the river and between it and the Croton dam. It was stipulated that the court should take such examination and observation of the premises into consideration in deciding the case.

I am convinced from such examination and from the testimony presented and the facts herein shown that the Croton river and bay are not navigable for commerce.

To change the present rigid railroad bridge of the defendant to a draw bridge would entail an expenditure by the defendant of over $3,000,000. To dredge the channel of the Croton river and construct bulkheads for commercial purposes on the property of the plaintiffs abutting on the river would involve an expenditure by them of over $400,000. This cost would be prohibitive, considering the various other water front lands on the Hudson in that section, a few miles above and below the defendant's railroad bridge, available for commercial use. The folly of carrying out the plan outlined by the witnesses on behalf of the plaintiffs in this respect is apparent upon examination of all the conditions. There are no factory buildings upon the Croton river or Croton bay.

The following are a few authorities of this and other jurisdictions indicating what the courts hold to determine whether a stream, river or bay is navigable for a highway of commerce or otherwise.

To determine whether or not a stream is navigable one must apply the test of navigability in fact instead of the old common law. (*The Daniel Ball*, 10 Wall. 557, 563; *The Montello*, 20 id. 430, 441; *Morgan* v. *King*, 35 N. Y. 454, 458.)

A waterway is navigable in fact only when it is used or susceptible of being used, in its natural and ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. (*United States* v. *Holt Bank*, 270 U. S. 49, 56 *et seq.; People ex rel. N. Y., O. & W. Ry. Co.* v. *State Tax Comm.*, 116 Misc. 774, 775; *People ex rel. N. Y. C. R. R. Co.* v. *State Tax Comm.*, 28 N. Y. St. Dept. Rep. 416, 423; *N. Y. C. & H. R. R. R. Co.* v. *State Tax Comm.*, 33 id. 517, 533; *People* v. *State Tax Comm.*, 39 id. 270, 312.)

" The term ' navigable waters of the United States ' has reference

to commerce of a substantial and permanent character to be conducted thereon." (*Leovy* v. *United States,* 177 U. S. 621, 632.)

" A navigable waterway is one that in its natural state is capable of affording a highway for useful commerce." ' (*Davis* v. *Gulf & I. Ry. Co.,* 31 F. [2d] 109, 110.)

" A stream which can only be made navigable or floatable by artificial means is not a public highway." (1 Kinney Irrigation & Water Rights, 570.)

The test whether a stream is navigable is to be determined by its usefulness in its natural state and not by the test of whether the stream could be utilized by expensive dredging and bulk headings to be carried out in order to make it navigable for commerce. What was done by commerce some forty or sixty years ago in connection with industries long since gone is no proof that any substantial or permanent commerce ever existed on this river or bay, and surely today and for many years past the river and bay had no substantial or permanent or useful commerce. Time has caused many changes in Croton river and the river or bay fails to show any of the requirements of a navigable highway.

To be useful as a public highway the stream " must be so situated, and have such a length and capacity, as will enable it to accommodate the public generally as a means of transportation." (*Haines* v. *Hall,* 17 Ore. 165, 172; 20 Pac. 831, 835.)

Croton river does not connect with other waterways or lead from one place to another and is not in the path of trade or travel. It is not open to the public and has no terminus or landing by which the public can enter it and another from which the public can leave it. These waters lead entirely into private lands easterly of defendant's bridge. (*Manigault* v. *Ward & Co.,* 123 Fed. 707, 713; *Mintzer* v. *North Am. Dredging Co.,* 242 id. 553; affd., 245 id. 297.)

There is no public dock, wharf, pier or landing place on the Croton river or bay easterly of the defendant's bridge, nor westerly thereof along the south shore of Croton point and the east bank of the Hudson river down to Ossining. The fact that the tide ebbs and flows thereon does not necessarily tend to demonstrate its navigable character. (*Chisolm* v. *Caines,* 67 Fed. 285, 292; *Mintzer* v. *North Am. Dredging Co., supra.*)

The use of small launches or row boats used for various purposes does not render the water navigable. (*Schulte* v. *Warren,* 218 Ill. 108, 119.) Commerce is lacking and such availability for this purpose cannot be construed as navigation. (*People* v. *N. Y. & O. W. Ry. Co.,* 133 App. Div. 476, 479.)

In *Rowe* v. *Granite Bridge Corp.* (21 Pick. 344) the court said (at

p. 347): " It is not every ditch, in which the salt water ebbs and flows, through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, which can be considered a navigable stream. Nor is it every small creek, in which a fishing skiff or gunning canoe can be made to float, at high water, which is deemed navigable. But in order to have this character, it must be navigable to some purpose, useful to trade or agriculture. It is not a mere possibility of being used under some circumstances, as at extraordinary high tides, which will give it the character of a navigable stream, but it must be generally and commonly useful to some purpose of trade or agriculture."

In *Harrison* v. *Fite* (148 Fed. 781, 783) HOOK, C. J., wrote (at p. 783): " To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation."

Whatever navigability was indulged in on the Croton river does not indicate that it is now navigable. Changes such as have occurred in the Croton river have rendered it unnavigable as a waterway which perhaps in its natural state was navigable.

Wrote the court in *Harrison* v. *Fite* (*supra*, 784): " It does not follow that, because a stream or body of water was once navigable, it has since continued and remains so. Changes may occur, especially in small and unimportant waters, from natural causes, such as the gradual attrition of the banks and the filling up of its bed with deposits of the soil, the abandonment of use followed by the encroachment of vegetation, and the selection by the water of other and more natural and convenient channels of escape, that work a destruction of capacity and utility as a means of transportation; and, when this result may fairly be said to be permanent,

a stream or lake in such condition should cease to be classed among those waters that are charged with a public use."

Since 1888, when the last boat passed through the draw, the deterioration in the capacity of the stream for the flotation of vessels of any but the very shallowest draft, which began with the flood of 1841, has steadily continued. The sedge lands in the bay have increased and the sand bar west of the railroad bridge has grown. The channel as a whole is shallower.

The diverting of the water because of the Croton dam in another source has undoubtedly aided the change in the stream. With the many changes it is not surprising that the stream was rendered unnavigable, where perhaps it was in a limited extent navigable before such changes.

Wrote the court in *Rex* v. *Montague* (4 Barn. & Cress. 598, 601, 602, 603): " It was for the defendant to make out that there once was a public navigation. Now it does not necessarily follow, because the tide flows and reflows in any particular place, that it is therefore a public navigation although of sufficient size * * *. But even supposing this to have been at some time a public navigation, I think that, from the manner in which it has been neglected by the public, and from the length of time during which it has been obstructed, it ought to be presumed that the rights of the public have been lawfully determined. Most probably the rights of the public (if they ever had any) arose from the flux and reflux of the tides of the sea, so as to make the channel navigable. If then the sea retreated, or the channel silted up, so as to be no longer navigable, why should not the public rights cease? If they arose from natural causes, why should not natural causes put an end to them? "

The construction, maintenance and operation of defendant's bridge across Croton bay was duly authorized by the State and has been and is in all respects lawful.

A structure erected by legislative enactment or by grant of the people cannot be a public nuisance. (*People* v. *Law*, 34 Barb. 494, 514; *Baxter* v. *Spuyten Duyvil & P. M. R. R. Co.*, 61 Barb. 428, 432.)

The defendant is the successor through various mesne consolidations of the Hudson River Railroad Company. (See the act authorizing the construction of a railroad from New York to Albany passed May 12, 1846, being chapter 216 of the Laws of 1846.)

Section 14 of the act provides in part as follows: " Whenever it shall be necessary for the construction of their single, double or treble railroad or way, to intersect or cross any stream of water, or water courses, * * * it shall be lawful for the said cor-

poration to construct their way or ways across or upon the same; but the corporation shall restore the stream, or water course, * * * to its former state in a sufficient manner so as not to have impaired its usefulness."

Section 15 provides that "The said corporation is hereby authorized to build or erect a bridge over the Spuytenduyvel creek and other navigable streams or inlets, for the passage of the said road or ways, from or to the city of New-York. Such bridges shall be substantially constructed, and shall contain a draw of sufficient width to admit the passage of vessels adapted to the navigation of said river, streams or inlet, with standing masts, and shall be so attended as not to obstruct, delay or hinder, the progress of any vessel navigating said river. They are also required to construct such bridges as may be necessary to provide for the free passage of such vessels and boats as heretofore have or now can pass into and from the same, the bays that may be crossed by said railroad; and if any wharf or dock shall be cut off by the said railroad, the said company shall extend or so improve the same as to restore it to its former usefulness, so far as it may be practicable to do so. And the owner or owners thereof are hereby authorized to occupy the river front, outside of said railroad, for the erection and use of wharves or docks."

The object of these provisions, in so far as they curtail the otherwise plenary power of the railroad company to construct bridges where necessary, is not to enrich riparian landowners, but to maintain the flow of commerce. In the case of " bays " the provision was so construed in *Getty* v. *Hudson River R. R. Co.* (21 Barb. 617) where the court held the word " bays " to mean " in view of public necessity, or convenience, such bays only as have a *general* navigation, deserving the name of navigation."

Provisions similar to those in the charter of the Hudson River Railroad Company embodied in the Railroad Law of 1850 (Chap. 140, § 28, subd. 5), since re-enacted without material change (Railroad Law, § 21, as amd. by Laws of 1928, chap. 546), have been uniformerly construed as not requiring the corstruction of a draw at a place where there is no commerce or general navigation.

In *Kerr* v. *West Shore R. R. Co.* (127 N. Y. 269) the court said (at p. 277): " The state may authorize the construction of bridges, piers, wharves or other obstructions in navigable waters, and when such structures are not obnoxious to the regulations of congress and do not come in conflict with the paramount authority of the United States they are not nuisances."

And construing section 28, subdivision 5, of the General Railroad Act, " This provision was designed by the Legislature to protect

public rights, and so far as it applies to a navigable river it is the commerce thereon and the general right of navigation that is intended to be protected. Hence it has reference to such streams and water-courses as were, before the construction of the road, capable of and accustomed to be generally navigated. * * * No general commercial interest infringed in this case. The bay in question was not navigable in the ordinary meaning of that term. That a vessel of light draft might at certain stages of the tide get nearer the shore than it can now in consequence of the existence of the road, does not make it, in a general sense, a navigable part of the river."

In *Ormerod* v. *New York, W. S. & B. R. R. Co.* (21 Blatchf. 106) the court refused to enjoin the railroad from constructing its road-bed and track in the Hudson river and so cutting off access to certain brick yards to which plaintiff had a contract to transport bricks in his schooner. The court held that there was no inter-ference with the general navigation of the river although the railroad would "intercept communication with the shore along that portion of the river where it" was to be located and would be "an impedi-ment to the riparian owners, and those who desire access by the river to their lands."

The head note of *Hedges* v. *West Shore R. R. Co.* (150 N. Y. 150) reads: " An action by the owner of land abutting on a tidal river, against a railroad company, for an injunction and the recovery of damages caused by an open piling and railroad superstructure below highwater mark, claimed to be an obstruction to his right of access to the channel, cannot be maintained when it appears that the alleged obstruction was erected and is maintained, in pursuance of legislative authority, upon the bed of the river, which the company acquired from the State, and that the natural condition of things was left practically unchanged and the abutting owner is given suitable and reasonable means of access to the channel. Such structure, lawful in its inception, does not become unlawful because it interferes with and obstructs a particular mode of access desired by the upland owner subsequent to its erection, involving the use of the bed of the river below high-water mark, which use is not incidental to his ownership of the uplands, but entirely distinct therefrom, such as the construction and use by him of an artificial canal for the floating of large vessels from his lands to the channel, across lands under water belonging to the state."

*Lehigh Valley R. R. Co.* v. *Canal Board* (146 App. Div. 151; affd., 204 N. Y. 471) was a case wherein it was claimed that the bridge in question was an unlawful structure. McLENNAN, P. J., wrote (at p. 158): " The construction of the bridge in question and the

operation of plaintiff's railroad over the same in no manner interfered with the usefulness of Seneca river as a navigable waterway for the reason that during that entire period and wholly independent of any acts committed by the plaintiff or its predecessors, such river was non-navigable for all practical purposes.

"It would be an unreasonable interpretation of the statute to hold that a railroad company was prohibited from crossing a stream or water course although at one time navigable but which because of the changed conditions had been abandoned and with the consent and acquiescence of the state its navigation made impossible."

The duties imposed upon defendant by section 15 of the charter of the Hudson River railroad are to be measured, not by such conditions as may have existed at various periods in the past, but by such conditions as now exist. That the railroad may have been obligated by its charter to construct and maintain a drawbridge over the Croton at the time the road was built — which may or may not have been the case — does not signify that it is obligated to do so today. Such charter provisions are subject to the rule of changed conditions. (*People ex rel. Frost* v. *N. Y. C. & H. R. R. R. Co.*, 168 N. Y. 187.)

In that case the Court of Appeals held that the obligation imposed on defendant's corporate predecessor by section 16 of this charter, to construct and sustain "convenient passes or roads across or under the railroad" for the benefit of landowners cut off by the railroad from access to the Hudson river, might, in view of changed conditions, be sufficiently met in 1901 by the maintaining of one culvert from a certain property from which access to the river had originally been afforded by means of six culverts, so that the discontinuance of the five additional culverts by defendant's corporate predecessor could not be held to be unlawful where the facts did not show whether or not the maintenance of the one culvert was insufficient to provide reasonable access under the conditions then prevailing.

The court wrote (at **p.** 194): "The statute imposes a continuing obligation upon the railroad company, and also affords a constant protection to the rights of the property owner whose lands are crossed by the tracks of the former.

"To say that the rights of the parties to this controversy depend wholly upon the situation as it existed in 1846, when the railroad was built, is to ignore the obvious intention of the legislature. The railroad company, while held strictly to its continuing obligation to construct and sustain 'convenient passes or roads across or under the railroad,' is not to be subjected to unnecessary or unreasonable burdens; the property owner, on the other hand, has

the continuing right to the usual access to the river ' for the purpose of farming or managing said lands.'

" As the years pass the question of present necessity is one that can be raised by either party. The principle involved is illustrated by cases where a covenant concededly binding upon a defendant will not be enforced in equity by reason of changed conditions."

In *Delaware & Hudson Co.* v. *Lawrence* (2 Hun, 163; affd., 56 N. Y. 612) POTTER, J., writing for the court, said (at p. 168): " A structure which promotes the convenience of the public cannot be a nuisance to it. * * * It is not, therefore, every encroachment upon the navigable waters of a stream, that is, *per se*, illegal or a nuisance. * * * It is possible that the public benefit to commerce arising from the erection of a wharf, will more than countervail for the public injury to navigation resulting from a narrowing of the stream. *Commerce* is the superior, and comprehends or includes navigation, which is subordinate to commerce. Navigation does not control commerce. ' Commerce includes navigation.' " And (at p. 169): " Commerce * * * is not subordinate to navigation, but includes it, and what is for the benefit of commerce, is not made to yield to and give place to what is claimed for free navigation. They are not convertible terms. At all events, the rights of commerce when they conflict with the rights of free navigation, have at least an equality of right to protection. Navigation, it is true, is one form of commerce, but it is not the whole of it; and is not to be protected at the expense of all others."

In *Devoe* v. *Penrose Ferry Bridge Co.* (Fed. Cas. No. 3845), GRIER, C. J., said (7 Fed. Cas. 568): " At common law, every obstruction, however small, to the free navigation of a public river, might, in strictness, be styled a nuisance. But the stringent application of this definition to every bridge over every creek where the tide ebbs and flows, or which a chance sloop might occasionally visit, would be absurd and highly injurious to public interests. Intercourse by means of turnpikes, canals, railroads and bridges is a public necessity. A railroad constructed by the authority of a state, is often many thousand times more beneficial to the interests of commerce than the unlimited freedom of navigation over unimportant inlets, creeks or bays, or remote portions of a harbor. It would be unreasonable to insist that the millions who travel on them, should be subjected to great delay or annoyance for the convenience of a few sloops or fishing smacks. * * * In every investigation of this kind the question is relative, not absolute. Whether a certain erection be a nuisance must depend upon the peculiar circumstances of each case — when the trade of the channel is of great amount and importance and that across it trifling, the

same rule cannot apply, as to a case where the conditions are contrary."

I do not believe that the plaintiffs have any standing in equity to maintain this action, and are barred by laches. For many years the railroad bridge over the Croton bay or river has been maintained and used as a fixed, rigid structure for the purposes of commerce served by the trunk line railroad system of the defendant's company. The plaintiffs and their predecessors in title have witnessed the development of this railroad system from its beginning and have made no protest, nor taken any action to protect what they allege are rights which justify the intervention of equity in their behalf.

Their ancestor, Pierre Van Cortlandt, conveyed to the Hudson River Railroad Company, a predecessor of defendant, the lands and lands under water upon and over which said railroad was constructed and has since been maintained. There was no reservation in the deed of access to the Hudson river. On the contrary, the railroad was released " from all damages which " the grantor " may sustain by reason of the construction of said road through his said lands and premises." (See stipulation and deed annexed thereto.)

Subsequently and by deed dated October 5, 1905, Anne S. Van Cortlandt, one of the plaintiffs herein, and Catherine T. R. Mathews, mother of the other two plaintiffs, conveyed to the New York State Realty and Terminal Company, a subsidiary of defendant, certain lands north of the bridge and on the east side of the railroad and by deed dated June 27, 1911, the same parties together with their brother, James S. Van Cortlandt, conveyed additional lands and lands under water east of the railroad to defendant's subsidiary company. Prior to the making of this conveyance, the railroad company had instituted condemnation proceedings against the grantors to acquire said lands so that they were fully advised of the purposes for which the lands were to be used. (*New York Central & H. R. R. R. Co.* v. *Mathews*, 144 App. Div. 732.)

Not only did the plaintiffs, or their predecessors in title, sell and convey lands to the railroad company and its subsidiary holding company for railroad purposes, but they witnessed the changes in the bridge and the expansion of the railroad in the vicinity thereof.

The bridge structures were and are in full view of the manor house. Bolton refers to this fact and the photographs, Exhibits M and O, show the view of the bridge from points close to the manor house. Miss Van Cortlandt, one of the plaintiffs, has spent her whole life at the manor house. She is now upwards of eighty years of age. Miss Mathews and her sister, Mrs. Mason, the other plaintiffs, were both born and brought up at the ferry house and the

manor house. Miss Mathews lived there upwards of forty years and down to the year 1920. She frequently rowed up and down the river and under the railroad bridge. Mrs. Mason lived there for about thirty years and until her marriage in 1909. James S. Van Cortlandt, their uncle, lived at the manor house for many years. Between May, 1893, and June, 1901, Mr. Bellew frequently saw him working in the field near the railroad tracks.

The present truss bridge, which is a rigid and immovable structure, was erected in 1898. Work was started in September, 1898, and completed in August, 1899. At that time the old tower of the draw span which had previously been dismantled was removed. All of said works was open, visible and well known to the plaintiffs.

Diligence is always required after notice and the law is that " the time at which a party appeals to a court of equity for relief affects largely the character of the relief which will be granted." (*New York City* v. *Pine,* 185 U. S. 93, 103; *Penrhyn Slate Co.* v. *Granville El. L. & P. Co.,* 181 N. Y. 80, 88; *Knoth* v. *Manhattan Ry. Co.,* 187 id. 243, 251.)

" Equity aids the vigilant and active, not the sleeping and indolent." (*Germantown Passenger Ry. Co.* v. *Fitler Co.,* 60 Penn. St. 124, 133.)

" An unexplained neglect to enforce an alleged right, for a long period, casts suspicion upon the existence of the right itself " (*Bean* v. *Tonnele,* 94 N. Y. 381, 386), and " it is the law of courts of equity, independent of positive legislative limitations, that they will not entertain stale demands." (*Matter of Neilley,* 95 N. Y. 382, 390.)

In *Calhoun* v. *Millard* (121 N. Y. 69) the court said (at p. 81): " It is and always has been the practice of courts of equity to remain inactive where a party seeking their interference has been guilty of unreasonable laches in making his application (Story's Eq. Jur. § 1520). The principle is stated with great force and clearness by Lord CAMDEN in *Smith* v. *Clay* (2 Ambl. 645): ' Nothing can call forth this court into activity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. *Laches* and neglect are discountenanced and, therefore, from the beginning of this court, there was always a limitation to suits in this court.

" Courts of equity, it has been said, act not so much in analogy to, as in obedience to statutes of limitation of legal actions, because where the legal remedy is barred, the spirit of the statute bars the equitable remedy also."

In *Penn Mutual Life Ins. Co.* v. *Austin* (168 U. S. 685) the court said (at p. 698): " The reason upon which the rule is based is not

alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words, where a court of equity finds that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect."

Joyce on Injunctions, volume 2, section 1117, expressly negatives plaintiffs' rights to relief in equity as follows: " One who seeks to abate an obstruction in a navigable stream and for an injunction must allege and show that the commerce for which he would utilize the stream is lawful. And where large interests are involved, and the obstructions to navigation which are complained of have been constructed under color of legislative authority, and have been used in promoting commerce and acquiesced in for a long time, equity will not interfere by perpetual injunction until the complainant's right has been established at law, and it appears that no adequate compensation can be afforded in damages."

That is precisely the present situation. There are large interests involved. The alleged obstruction was constructed under legislative authority. The bridge has been used in promoting commerce, and acquiesced in for a long time.

The State has made no complaint, nor the United States. This action is by individuals, and I do not believe that it is within the court of equity to grant to the plaintiffs any relief.

As was said by Mr. Justice MULLIN in *Fort Plain Bridge Co.* v. *Smith* (30 N. Y. 44, at p. 62): " On the facts found in this case, the Mohawk river is not navigable, except to a very limited extent. Its capability for navigation has been very materially lessened within the last thirty years; hence the rules of law which applied to it then do not apply to it now.

" But assuming that it is a public highway, and that the bridge is an obstruction to navigation, and therefore a public nuisance, yet no one has the right to abate it, or sustain an action for damages occasioned by the erection, unless he has himself sustained some damages not sustained by the rest of the community." (*Pierce* v. *Dart*, 7 Cow. 609; *Lansing* v. *Smith*, 8 id. 146; *Mills* v. *Hall*, 9 Wend. 315; *Meyers* v. *Malcolm*, 6 Hill, 292; *Duncan* v. *Thwaites*, 3 B. & C. 556; *Rose* v. *Miles*, 4 M. & S. 101; *Butler* v. *Kent*, 19 Johns. 223; *Harrower* v. *Ritson*, 37 Barb. 301.)

In *People ex rel. Lehigh V. Ry. Co.* v. *Tax Comm.* (247 N. Y. 9) the learned Judge CARDOZO wrote (at p. 16): " The line between navigable and non-navigable waters is not always an easy one to

draw. [Citing *Egan* v. *Hart*, 165 U. S. 188.] Much will often depend upon the acquiescence of the State. Even an unlawful obstruction may not be abated as a nuisance at the suit of private persons if the State does not complain, and there is no showing of special damage by the champions of the public right. [Citing *Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 44, 62.]"

I decide that the waters of the Croton river or bay at the *locus in quo* are not navigable in fact. The construction, maintenance and operation of defendant's bridge across Croton bay was duly authorized by the State and has been and is in all respects lawful.

Plaintiffs have no standing in equity to maintain this action. Defendant has established the right to maintain its railroad bridge by prescription against the plaintiffs, even if the defendant did not originally have that right. Complaint dismissed.

Present findings.